# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

No. 20-6380

_____

SCOTT A. HARDIN

*Plaintiff—Appellant*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; ET AL.

*Defendants—Appellees*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

_____

**BRIEF FOR APPELLANT**

Jason Todd Hardin
HARDIN LAW, PLLC
P. O. Box 9537
Louisville, Kentucky 40209
Phone: (502) 445-2673
Fax: (502) 219-3323


J. Allan Cobb
COBB LAW PLLC
1303 Clear Springs Trace, Unit 100
Louisville, Kentucky 40223
Phone: (502) 966-7100

*Counsel for Appellant*

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

No. 20-6380

SCOTT A. HARDIN

*Plaintiff—Appellant*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, ET AL.

*Defendant—Appellee*

## RULE 26.1 DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

Pursuant to the Sixth Circuit Rule 26.01, Plaintiff-Appellant, Scott A. Hardin, makes the following disclosure:

1) Is said party a subsidiary or affiliate of a publicly owned corporation? **NO.**

2) Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? **NO.**


*s/Jason Todd Hardin*                                    **February 8, 2021**
**Jason Todd Hardin**                                    **Date**

i

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT……………………………….i

TABLE OF CONTENTS…....……………………………………..…………ii

TABLE OF AUTHORITIES…………………………………...……………iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT……………………x

STATEMENT OF JURISDICTION……………………………………1

STATEMENT OF THE ISSUES…………………………………………3

STATEMENT OF THE CASE……………………………………………4

SUMMARY OF ARGUMENT……………………………………………15

ARGUMENT……………………………………………………………18

    A. The Standard of Review is *De Novo*………………………..…18

    B. The ATF's Exceeded its Statutory Authority….………………18

    C. The District Court Erred in its Reliance on the Chevron  Doctrine…21
       1. The Government Waived Reliance on the Chevron Deference….21
       2. The Chevron Deference has no Role when Liberty is at Stake….23
         a. The Rule of Lenity Prevails Over the Chevron Deference…..24
         b. The Rule of Lenity Applies in Civil Statutes that Impose
           both Criminal and Civil Penalties…………………………..27
         c. The Rule of Lenity Promotes Due Process and the
           Separation of Powers………………………………………29

    D. The ATF's Final Rule violates the United States Constitution……..30
       1. Takings Without Just Compensation……………………………30
       2. Ex Post Facto Violation…………………………………………33
       3. ATF's Reversal Creates Constitutional Vagueness……………...35

    E. The ATF's Final Rule is Arbitrary and Capricious…………………37

F.  The Process in the Promulgation of the ATF's Final Rule
Violated the APA…………………………………………………44
1.  Procedural Irregularities with Comment Period………………44
2.  Failure to Provide 90-Day Comment Period…………………..46
3.  Failure to Consider Cost-Impact and Erroneous Cost Estimate.47

G.  Implementation and Enforcement of the ATF's Final Rule
Violates the Internal Revenue Code………………………………48


CONCLUSION…………………………………………………………..49

CERTIFICATE OF COMPLIANCE……………………………….....51

CERTIFICATE OF SERVICE…………………………………………..52

ADDENDUM
DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS....53

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                      <u>PAGE</u>

*Abramski v. United States*,
573 U.S. 169 (2014)……………………………………………..25, 27

*Alexander v. Sandoval*,
532 U.S. 275 (2001)…………………………………………..25

*Animal Legal Def. Fund, Inc. v. Perdue*,
872 F.3d 602 (2017 D.C. Cir.) ………………………………….38

*BNSF R. Co. v. Loos*,
139 S.Ct. 893 (2019) ……………………………………………23

*Bradley v. Secretary of Health and Human Services*,
991 F.2nd 1570 (Fed. Cir. 1993)……………………………… 2, 18

*Brendale v. Confederated Tribes & Bands of Yakima
Indian Nation*, 492 U.S. 408 (1989)……………………………..32

*Calder v. Bull*,
3 U.S. 386 (1798)…………………………………………….....33

*Carter v. Welles-Bowen Realty, Inc.*,
736 F.3d 722 (6th Cir. 2013) ……………………………….... 26-28

*Center for Science in Public Interest v. Department
of Treasury*, 573 F. Supp. 1168 (D.C. 1983) …………………… 5

*Chevron, U.S.A., Inc. v. Natural Resources Defense
Council, Inc.*, 467 U.S. 837 (1984) …………………………….18, 39

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)…………………………………………….13

*Cty. of L.A. v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999)…………………………………44

*Collins v. Youngblood*,
497 U.S. 37 (1990)…………………………………………………33-34

*Epic Systems Corp. v. Lewis*
584 U.S., at ____ (slip op., at 20); 138 S.Ct. 1612 (2018)…….. 23

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)…………………………………………..39

*Grayned vs. City of Rockford*,
408 U.S. 104 (1972)…………………………………………..36

*Guedes v. Bureau of Alcohol, Tobacco, Firearms*
*& Explosives*, 920 F.3d 1…………………………..13, 21, 22, 41, 45

Statement of Gorsuch, J., 589 U.S. _____(2020)
(in denial of petition for a writ of cert in *Guedes*). ……........15, 22-23

*Gun Owners of Am., Inc. v. Barr*,
No. 19-1298, 2019 WL 1395502, at *1 (6th Cir. Mar. 25, 2019)..13,21

*Horne v. Dep't of Agric.*,
576 U.S. 351 (2015)…………………………………………..30

*I.N.S. v. St. Cyr*,
533 U.S. 289 (2001)…………………………………………..25

*Johnson v. Quander*,
440 F.3d 489 (D.C. Cir. 2006)…………………………………34

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) ………………………………………25

*Leocal v. Ashcroft*,
543 U.S. 1 (2004)…………………………………………..27, 29

*Liparota v. United States*,
471 U.S. 419 (1985)…………………………………………24, 29, 30

*McBoyle v. United States*,
283 U.S. 25 (1931)…………………………………………….. 29

*Moore v. Smith*,
360 F. Supp. 3d 388 (E.D. La. 2018)………………………….. 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto*
*Ins. Co.*, 463 U.S. 29 (1983)…………………………………… 38

*Murr v. Wisconsin*,
137 S. Ct. 1933 (2017)………………………………………… 31

*New Mexico v. Dep't of Interior*,
854 F.3d 1207 (10th Cir. 2017)………………………………… 39

*New Prime Inc. v. Oliveira*,
586 U.S. ---, 139 S.Ct. 532 (2019) ……………………….….. 40

*Pumpelly v. Green Bay & Mississippi Canal Co.*,
80 U.S. 166 (1871)……………………………………………... 30

*Simms v. Nat'l Highway Traffic Safety Admin.*,
45 F.3d 999 (6th Cir. 1995)………………………………….. 13

*Smith v. Doe*,
538 U.S. 84 (2003)………………………………………….. 34

*Solid Waste Agency of N. Cook Cty. v. U.S.*
*Army Corps of Engineers*, 531 U.S. 159 (2001)………………. 25

*Stand Up for California! v. United States DOI*,
204 F. Supp. 3d 212 (D.C. 2016)……………………………… 44

*Staples v. United States*,
511 U.S. 600 (1994)…………………………………………… 39, 41

*Util. Air Regulatory Group v. EPA*,
573 U.S. 302 (2014)…………………………………………… 18

*United States v. Apel*,
571 U.S. 359 (2014)……………………………………………… 26

*United States v. Davis*,
139 S. Ct. 2319 (2019)…………………………………………..24

*United States v. Granderson*,
511 U.S. 39 (1994)………………………………………………25

*United States v. Hudson*,
7 Cranch 32 (1812)………………………………………………24

*United States v. Mead Corp.*,
533 U.S. at 218 (2001)…………………………………………… 21

*United States v. Olofson*,
563 F.3d 652……………………………………………………41

*United States v. Rentz*,
777 F.3d 1105 (10th Cir. 2015) (en banc) ……………...24, 26, 29-30

*United States v. Richter*,
796 F.3d 1173 (10th Cir. 2015)………………………………… 25

*United States v. R.L.C.*,
503 U.S. 291 (1992)…………………………………………… 29-30

*U. S. vs. Robinson*,
361 U.S. 220 (1960)……………………………………………..2, 18

*United States v. Santos*,
553 U.S. 507 (2008) ……………………………………………28

*United States v. Smith*,
756 F.3d 1179 (10th Cir. 2014)………………………………… 24

*United States v. Thompson/Ctr. Arms Co.*,
504 U.S. at 517–18………………………………………….. 28-29

*United States v. Universal C. I. T. Credit Corp.*,
344 U.S. 218 (1952)………………………………………… 28

*United States v. Wiltberger*,
18 U.S. 76 (1820)…………………………………………… 24

*Webster v. Luther*,
163 U.S. 331 (1896) ………………………………………… 39

*Whitman v. United States*,
574 U.S. 1003 (2014) ……………………………………….. 26

*Wilkins v. Daniels*,
744 F.3d 409 (6th Cir. 2014) ………………………………… 33

*In re Woolsey*,
696 F.3d 1266 (10th Cir. 2012)……………………………… 28

## **<u>STATUTES</u>**

5 U.S.C. § 500, et seq.……………………………………….. 1, 5
5 U.S.C. §§ 552, 702, 703, 704, 706…………………………. 1, 2, 12,18
5 U.S.C. § 706(2)(A)………………………………………… 37
6 U.S.C. 531…………………………………………………. 36
Gun Control Act, 18 U.S.C. §921, *et seq.* ……………………... 1, 8, 36
18 U.S.C. §§ 922, 923………………………………………. 28, 42
18 U.S.C. Section 924(a)(2)………………………………….. 15, 23
18 U.S.C. § 926(b)………………………………………….. 46
National Firearms Act, 26 U.S.C. § 5841, *et seq*……………….. 1, 40
26 U.S.C. § 5845(a) ………………………………………… 36
26 U.S.C. § 5845(b)………………………………………….8, 19, 40
26 U.S.C. Section 5658(b)…………………………………… 15, 23
26 U.S.C. § 7805, 7805(b)……………………………………1,3,12,48-49
28 U.S.C. §§ 1331, 1343, 1346, 2201, 2202, and 2412…………1, 12, 13

## **<u>REGULATIONS</u>**

27 C.F.R. §§ 447.11…………………………………………..10
27 C.F.R. §§ 478.11 and 479.11 ………………………………8, 11-12
81 Fed. Reg. 2658 through 2723……………………………… 49
82 Fed. Reg. 60929 …………………………………………… 7
83 Fed. Reg. 13450, 13451……………………………............. 31

83 Fed. Reg. 13442……………………………………….. 1, 8
83 Fed. Reg. 13443, 13445, 13446, 13448…………..8-9,12,31,34,38
83 Fed. Reg. 13454……………………………………….. 43
83 Fed. Reg. 66527, 66533-34 ……………….......................... 20
83 Fed. Reg. 66540 …………………………………………20
83 Fed. Reg. 66541-42………………………………………..47
83 Fed. Reg. 66514, 66553-54………………………..11-12,20,41-42

## **MISCELLANEOUS**

Eskridge & Baer, The Continuum of Deference:
     Supreme Court Treatment of Agency Statutory
     Interpretations From *Chevron* to *Hamdan*,
     96 Geo. L.J. 1083, 1121-1124 (2008)…………………... 22

Merrill, Judicial Deference to Executive Precedent,
     101 Yale L. J. 969, 982-984 (1992)……………………... 23

Antonin Scalia & Bryan A. Garner, Reading Law:
     The Interpretation of Legal Texts 343 (2012) ………….. 24

## **CONSTITUTION**

Article I, Section 9, Clause 3 of the Constitution
of the United States…………………………………………….. 16, 33

Takings Clause of the Fifth Amendment of the Constitution
of the United States…………………………………………...16, 30

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Sixth Circuit Rule 34(a)(1) and Sixth Circuit Rule 34(a), Scott A. Hardin ("Hardin"), respectfully requests that the Court schedule oral arguments in this case. This case presents important constitutional questions, statutory interpretation issues, and the role of the federal courts in reviewing administrative rulemaking; the consequence of such in this action carries the possibility of criminal sanctions, not just for Hardin, but for thousands of similarly-situated, law-abiding American citizens. Oral arguments would permit clarification of these complex legal issues, and the proper interpretation of the law regarding federal statutes on the ban of machineguns; the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") recent rule banning bump-stock devices; and the District Court's error in its reliance on, and application of, the Chevron Deference Doctrine in reviewing, and upholding, said ATF ban.

## STATEMENT OF JURISDICTION

Hardin filed his Complaint in District Court, challenging ATF's implementation and enforcement of an agency regulation under Docket No. ATF-2017R-22 ("Final Rule"), designed to criminalize the ownership, possession or transportation of "bump-stock-type" devices by redefining them as "machineguns" for purposes of the criminal proscriptions under the National Firearms Act ("NFA") 26 U.S.C. § 5841, *et seq*., and the Gun Control Act ("GCA") 18 U.S.C. §921, *et seq. See* 83 Fed. Reg. at 13442. All "current possessors of these devices would be required to surrender them, destroy them, or otherwise render them permanently inoperable upon the effective date of the [F]inal [R]ule." 83 Fed. Reg. 66514, 66553-54. Hardin challenged the Final Rule as exceeding ATF's statutory authority, and violating the Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, et seq.

Hardin's Complaint sought relief pursuant to 5 U.S.C. §§ 552, 702, 703, 704; 26 U.S.C. § 7805; and 28 U.S.C. §§ 1331, 1343, 1346, 2201, 2202, and 2412. Therefore, the District Court's subject matter jurisdiction was based on 5 U.S.C. §§ 702 and 704 and 28 U.S.C. § 1331, as this action arises under the APA, as well as the Constitution and laws of the United States (NFA and GCA).

This appeal comes before this Court by way of the District Court, wherein the District Court granted a Final and Appealable Judgment in favor of ATF, et al.,

and dismissed Hardin's Complaint, with respect to all claims asserted in the matter, on the parties' cross-motions for judgment, entered on November 30, 2020, pursuant to FRCP 58, and in accordance with the District Court's Memorandum Opinion and Order, entered November 20, 2020. See DN36, Page ID#911, and DN35, Page ID# 894-910, respectively.

All questions of law are to be reviewed de novo. *See Bradley v. Secretary of Health and Human Services*, 991 F.2nd 1570, 1574 n. 3 (Fed. Cir. 1993).  The APA itself provides, "a reviewing court shall decide all relevant questions of law," and shall "interpret constitutional and statutory provisions." 5 U.S. §706. As an appeal of right, and a timely and proper Notice of Appeal having been filed by Hardin on December 2, 2020, this Court has jurisdiction over this appeal. *U. S. vs. Robinson*, 361 U.S. 220 (1960); FRAP 3.

## **STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1) Whether ATF's Final Rule exceeded its statutory authority by redefining "machinegun" to include bump-stock devices.

2) Whether the District Court erred in its reliance on, and application of, the Chevron Deference Doctrine in its analysis.

3) Whether the District Court erred in its application of the Chevron Deference Doctrine over the Doctrine of Lenity to the issues at bar.

4) Whether ATF's Final Rule violated provisions of the United States Constitution, namely, the Takings Clause, and the Ex Post Facto Clause.

5) Whether ATF's Final Rule is Arbitrary and Capricious.

6) Whether the rulemaking process in the promulgation of the ATF's Final Rule violated the APA.

7) Whether the implementation and enforcement of ATF's Final Rule violates the Internal Revenue Code (26 U.S.C. 7805, et seq.).

## **STATEMENT OF THE CASE**

Hardin, a resident of Jefferson County, Kentucky, is a physician, specializing in anesthesiology, duly licensed with the Commonwealth of Kentucky, since 2012, and has been a competitive shooter for several years, having received his first sponsorship as a competitor shooter in March of 2017. From approximately 1996 to 2002, Hardin was licensed by the Kentucky Department of Criminal Justice Training to teach the Carrying Concealed Deadly Weapons (CCDW) course. (Hardin's Complaint, DN3 Page ID# 70)

On or about April 18, 2018, Hardin became interested in purchasing a bump stock device; but before purchasing such a device, Hardin researched whether ATF had approved that particular device. According to Hardin's pre-purchase research, ATF had approved the device in a written determination letter dated April 2, 2012. (Hardin's Complaint, DN3 Page ID# 70). Relying upon this determination from ATF, Hardin purchased an SSAK-47 XRS bump stock, SSAR-15 MOD bump stock, and a SSAR-15 OGR bump stock for $159.95, 329.95, and $179.95, respectively, which he still possessed at the time of filing his Complaint in District Court. (Hardin's Complaint, DN3 Page ID# 70).  Hardin desires, and asserts that he would be entitled, to continue lawful possession and/or transportation of this bump-stock device but for the Final Rule.

ATF's Notice of Proposed Rulemaking (for the Final Rule at issue) comes after years of public pronouncements and formal rulings in which the agency declared these very same Bump-Stock-Type devices are *not* "machineguns" and therefore are *not* subject to the criminal regulation that ATF sought to establish in its Final Rule. These were representations of the very government agency on which the public was entitled to, and did reasonably, rely in purchasing, possessing, and using these devices.

ATF's sudden about-face on this issue in promulgating and implementing the Final Rule to criminalize that which it had for years expressly deemed legal under the law of Congress constitutes agency abuse of discretion, and arbitrary and capricious conduct, in clear violation of applicable law, without substantial evidence. *See Center for Science in Public Interest v. Department of Treasury*, 573 F. Supp. 1168, 1172 (D.C. 1983) ("sudden and profound alterations in an agency's policy constitute 'danger signals' that the will of Congress is being ignored").

ATF's Final Rule is the product of serious, multi-dimensional legal violations rendering the process and the rule invalid, including, *inter alia*: ATF's Final Rule exceeds its statutory authority to promulgate regulations for purposes of implementing or enforcing the NFA or the GCA; ATF's procedural process violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq*., in numerous material ways; any implementation or enforcement of the Final Rule

would violate the fundamental constitutional protections against retroactive imposition of criminal punishment under *ex post facto* principles; and it would constitute an unconstitutional taking without just compensation.

ATF is the federal government agency, which has assumed responsibility for promulgating and enforcing regulations under the statutory provisions of the GCA and the NFA on which ATF has relied as the ostensible basis for its authority to issue the Final Rule. The Attorney General is responsible for executing and administering the laws, regulations, customs, practices, and policies of the United States including the implementation and enforcement of the Final Rule. The Attorney General is ultimately responsible for supervising the functions and actions of the United States Department of Justice, including the ATF, which is an arm of the Department of Justice. The ATF is responsible for, *inter alia*, regulating and licensing the sale, possession, transfer, and transportation of firearms and ammunition in interstate commerce, including "machineguns" as that term is defined under the NFA, GCA, and any purported agency regulations of ATF. The Director of ATF is responsible for the creation, implementation, execution, and administration of the laws, regulations, customs, practices, and policies of the United States, including implementation and enforcement of the Final Rule.

On December 26, 2017, ATF published the Advance Notice of Proposed Rulemaking ("ANPRM") in the Federal Register and on federalregister.gov,

seeking public input concerning its proposed new treatment of "bump-stock-type" devices under the Final Rule. 82 Fed. Reg. at 60929 (Administrative Record #000773-776). In the ANPRM, ATF sought certain information pertaining to bump stocks including, but not limited to: calendar years produced; economic impact of ATF classifying bump stocks as machine guns; use(s) for which the device was marketed; number of bump stocks sold; and purposes bump stocks are used for. On March 29, 2018, ATF published its Notice of Proposed Rulemaking ("NPRM") concerning the Final Rule in the Federal Register and on federalregister.gov. 83 Fed. Reg. at 13442 (Administrative Record #001238, et seq.).

In the NPRM, ATF stated, *inter alia*, that

When a bump-stock-type device is affixed to a semiautomatic firearm, however, the device harnesses the recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by "bumping" the shooter's stationary trigger finger without additional physical manipulation of the trigger by the shooter. The bump-stock-type device functions as a self-acting and self-regulating force that channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge (as designed). No further physical manipulation of the trigger by the shooter is required....These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure. The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire.

83 Fed. Reg. at 13443, 13446.

ATF announced that its intention behind the new rule was "to clarify that 'bump fire' stocks, slide-fire devices, and devices with certain similar characteristics (bump-stock-type devices) are 'machineguns' as defined by the [NFA] and the [GCA], because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of a trigger." 83 Fed. Reg. at 13442. Both the NFA and GCA define "machinegun" to include any "weapon which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," as well as the frame or receiver of such a weapon or any parts or combination of parts that could be converted or assembled into such a weapon. 26 U.S.C. § 5845(b); 18 U.S.C. § 921. At the time of the NPRM, the regulations under 27 C.F.R. §§ 478.11 and 479.11 contained the same general definition of "machinegun." ATF's new Final Rule amended these to specifically define "single function of the trigger" to mean "single pull of the trigger," and to define "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." 83 Fed. Reg. at 13442.

ATF acknowledged it had made a series of previous determinations over the last decade that declared the same kind of "bump-stock-type" devices – operating

with the same sort of functionality that the new rule seeks to prohibit – did *not* constitute "machineguns" within the meaning of the governing law. (Administrative Record #000134-145). Specifically, ATF admitted that between 2008 and 2017, it issued classification decisions and letter rulings concluding that "'bump-stock-type' devices that enable a semiautomatic firearm to shoot more than one shot with a single function of the trigger by harnessing a combination of the recoil and the maintenance of pressure by the shooter, do not fire 'automatically'" within the meaning of a "machinegun" as that term is defined under the law. 83 Fed. Reg. at 13443, 13445.

Further, although now seeking to prohibit "all bump-stock-type devices" through the Final Rule on the basis that additional "legal analysis" supports the opposite conclusion that they convert the firearm into a prohibited "machinegun," 83 Fed. Reg. at 13443, ATF's NPRM at the same time conceded that such devices are neither essential nor necessary to this functionality of a firearm because individuals can "replicate the effects of bump-stock-type devices" through myriad other means, such as by "us[ing] rubber bands, belt loops, or otherwise train[ing] their trigger finger to fire more rapidly," *Id.* at 13454.

Comments were required to be submitted on or before June 27, 2018. Fed. Reg. at 13446. Comments documented numerous deficiencies regarding ATF's NPRM, including, but not limited to, several of the procedural and substantive

violations giving rise to the causes of action in this case: 1) ATF's exceeding its statutory authority in the promulgation of the Final Rule; 2) the arbitrary and capricious nature of the Final Rule; and 3) ATF's failure to provide the necessary supporting documents in the rulemaking process, thereby denying interested all parties an opportunity to fully consider and respond to the claims made by ATF in support of the Final Rule.

On December 18, 2018, Defendant Matthew Whitaker (Acting Attorney General at the time) executed the Final Rule; thereby, purportedly making effective the Final Rule. The Final Rule, executed by Defendant Whitaker, was published and otherwise made available online on the Justice Department and ATF websites on December 18, 2018. On December 21, 2018, a link was published on the Federal Register website to download a copy of the Final Rule.  On December 26, 2018, the Final Rule was published in the Federal Register. The Final Rule, spanning 157 pages, implements changes to 27 C.F.R. §§447.11, 478.11, 479.11, almost identical to the proposed changes in the NPRM. Specifically, the definition of "Machinegun" is modified in §447.11 such that, pursuant to the Final Rule, it will provide:

> A "machinegun", "machine pistol", "submachinegun", or "automatic rifle" is a firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed

and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machinegun" includes a bump-stock-type device, i.e., a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. at 66553-66554.

The definition of "Machine gun" is modified in §478.11 such that, pursuant to the Final Rule, it will provide:

For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. at 66554.

11

The definition of "Machine gun" is modified in §479.11 such that, pursuant to the Final Rule, it will provide:

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. at 66554.

In connection with its NPRM, ATF failed to include in the agency docket folder any supporting documentation for its newly formed determination that its previous, directly opposite conclusion about bump-stock-type devices "does not reflect the best interpretation of 'machinegun'" under the NFA and GCA. 83 Fed. Reg. at 13443.

Hardin sued the ATF, the acting Attorney General and acting ATF Director at the time, and the United States of America, in District Court, challenging the implementation and enforcement of the Final Rule, as exceeding ATF's statutory authority, and violating the Constitution and the APA, and seeking relief pursuant to 5 U.S.C. §§ 552, 702, 703, 704; 26 U.S.C. § 7805; and 28 U.S.C. §§ 1331, 1343,

1346, 2201, 2202, and 2412. The District Court granted Judgment in favor of ATF, et al., and dismissed Hardin's Complaint, on the parties' cross-motions for judgment, entered on November 30, 2020, pursuant to FRCP 58, and in accordance with the District Court's Memorandum Opinion and Order (the "District Court Opinion"), entered November 20, 2020. (Judgment, DN36 Page ID#911, and District Court Opinion, DN35 Page ID# 894, respectively).

The District Court, tasked with determining whether the Final Rule followed the proper rulemaking process as prescribed the APA, must set aside such agency action if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Simms v. Nat'l Highway Traffic Safety Admin*., 45 F.3d 999, 1003 (6th Cir. 1995) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971)). The District Court, utilizing the two-step framework of the *Chevron* Deference doctrine, found the statutory definition of "machinegun" to be ambiguous, that ATF reasonably interpreted the definition of "machinegun"; and therefore, ATF did not exceed its statutory authority in promulgating the Final Rule (the District Court conceded that the 6th Circuit has not analyzed *Chevron's* applicability to the Final Rule, so it relied upon *Gun Owners of Am., Inc. v. Barr*, No. 19-1298, 2019 WL 1395502, at *1 (6th Cir. Mar. 25, 2019), and *Guedes II*, 920 F.3d at 17).

13

The District Court in its Opinion also rejected Hardin's argument that the Final Rule is arbitrary and capricious, by finding that (1) ATF "examined the relevant data and articulated a satisfactory explanation for its action"; (2) ATF's "focus on the movement of the shooter's finger – rather than the trigger's movement – accords with its permissible definition of "single function of the trigger" as meaning "single pull of the trigger"; (3) ATF is entitled to a "presumption of regularity in its promulgation of the [Final] Rule"; and (4) ATF had "good reasons for the new policy" (District Court Opinion, DN35 Page ID# 901-904). Further, the District Court found that "harmless-error rule precludes invalidation of the [Final] Rule" on the grounds of comment period and procedural irregularities, and summarily disposed of Hardin's Constitutional claims and IRC violations.

## SUMMARY OF ARGUMENT

"Does owning a bump stock expose a citizen to a decade in federal prison? For years, the government didn't think so. But recently the Bureau of Alcohol, Tobacco, Firearms and Explosives changed its mind. Now, according to a new interpretative rule from the agency, owning a bump stock is forbidden by a longstanding federal statute that outlaws the "possession [of] a machinegun." 26 U.S.C. §5658(b), 18 U.S.C. §924(a)(2)." Statement of Gorsuch, J., 589 U.S. _____(2020) (in denial of petition for a writ of cert in *Guedes*).

Congress clearly defined "machinegun" as a firearm which essentially is designed only to shoot automatically more than one shot, without manual reloading, by a single pull of the trigger. Notwithstanding unambiguous Congressional language, ATF's Final Rule exceeded its statutory authority by redefining "machinegun" to include bump-stock devices.

The District Court erroneously relied upon the *Chevron* deference to find the statutory definition of "machinegun" to be ambiguous; that ATF reasonably interpreted the definition of "machinegun"; and therefore, ATF did not exceed its statutory authority in promulgating the Final Rule (despite the fact that neither Hardin nor ATF asserted that the *Chevron* doctrine applies). One, the ATF expressly conceded that deference is not required to resolve this case; consequently, the government loses the benefit of *Chevron* in review of this

15

action. Two, because the Final Rule carries with it the possibility of criminal sanctions, the District Court should have analyzed this case under the Rule of Lenity, not the *Chevron* doctrine. The rule of lenity ensures that Congress, which is most accountable to the people, establishes criminal sanctions, not an unaccountable bureaucracy, interested prosecutor, or remote judiciary.

The Final Rule also has serious constitutional implications under the Takings Clause of the Fifth Amendment and Article I, Section 9, Clause 3 of the U.S Constitution. Hardin has established concrete damages based on the verified purchase price of his lawfully purchased, but now outlawed, bump-stock-type devices. But not only has ATF destroyed all value and beneficial use of bump-stock-type devices without providing any just compensation, harsh criminal consequences flow from ATF's about-face on the classification of bump-stock-type devices. Such a reversal by the ATF creates constitutional vagueness and uncertainty.

Lastly, ATF's Final Rule is arbitrary and capricious, and was promulgated in violation of the rulemaking process, governed by the APA, which was wrought with procedural irregularities and errors. ATF's Final Rule is not only procedurally and substantively invalid, but any implementation or enforcement of the rule against such devices manufactured or assembled before the date of the NPRM publication would violate provisions of the Internal Revenue Code.

In District Court, the government clearly laid out its sole reasoning for the ATF's reversal in promulgating and implementing the Final Rule to criminalize that which it had for many years expressly deemed legal under the applicable acts of Congress. By the ATF's own admission, the mass murder in Las Vegas in October of 2017 was the impetus for ATF's redefining of bump stocks and machine guns. It is entirely appropriate for Congress to debate and consider policies that regulate bump stocks. However, the essential issue at hand was, and always has been, about who has the constitutional prerogative to change the law, even in response to national tragedies.

Bottom line, Congress has not prohibited bump stocks, and it is unlawful for a prosecutorial administrative agency, like the ATF, to rewrite Acts of Congress. The Final Rule at issue was a circumvention of Congress, thus bypassing and violating basic constitutional principles concerning who makes the law in this country, for the reasons set out below.

# ARGUMENT

## A. THE STANDARD OF REVIEW IS *DE NOVO*.

The issues at hand involve questions of law, namely, interpreting the NFA and GCA; determining the scope of ATF's rule making authority; the proper rule of construction in reviewing federal agency action that imposes criminal penalties; and constitutional questions, and thus must be resolved *de novo* on appeal. *See Bradley v. Secretary of Health and Human Services*, 991 F.2nd 1570, 1574 n. 3 (Fed. Cir. 1993). The APA itself provides, "a reviewing court shall decide all relevant questions of law," and shall "interpret constitutional and statutory provisions." 5 U.S. §706. As an appeal of right, and a timely and proper Notice of Appeal having been filed by Hardin on December 2, 2020, this Court has jurisdiction over this appeal. *U. S. vs. Robinson*, 361 U.S. 220 (1960); FRAP 3.

## B. THE ATF EXCEEDED ITS STATUTORY AUTHORITY

The ATF's Final Rule exceeded its statutory authority by redefining "machinegun" to include bump-stock devices. The "core administrative-law principle" is that "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 327 (2014); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984) ("If the intent of Congress is clear,

that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Congress has clearly defined "machinegun" to include only a firearm "which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," and the frame or receiver of such a weapon, or parts or combination of parts that could be converted or assembled into such a weapon. 26 U.S.C. § 5845(b); 18 U.S.C. § 921. The express purpose behind the Final Rule's alteration and expansion of this definition is to capture "*all* bump-stock type devices" with the law's prohibitive sweep based upon ATF's conclusion – directly countered by all the available evidence and logic – that such devices enable shooters to shoot *automatically* through a "self-acting or self-regulating" firing mechanism.

Because there is no support for ATF's conclusion about the functionality of these devices, it has necessarily exceeded its statutory authority by purporting to expand the law of Congress for the specific purpose of regulating firearms such devices as prohibited "machineguns." Indeed, through its previous formal determinations that bump stock devices are *not* "machineguns," ATF itself has conceded that it lacks the authority to regulate these devices at all, stating it "does

not have authority to restrict [bump-stock devices'] lawful possession, use or transfer." (Exhibit A to Hardin's Complaint, DN3-1 PageID#98).

Moreover, in its Final Rule, ATF admits that it has exceeded the authority granted to it. "The Department agrees that regulatory agencies may not promulgate rules that conflict with statutes." 83 Fed. Reg. at 66527. "The NFA is a statute, which only Congress may repeal or alter." 83 Fed. Reg. at 66540. Perhaps most importantly, "the statutory definition *alone* determines whether a firearm is a machinegun." 83 Fed. Reg. at 66533-34 (emphasis added). The Final Rule then goes on to declare that the "Department believes that this rule's interpretations of 'automatically' and 'single function of the trigger' in the statutory definition of 'machinegun' accord with the plain meaning of those terms. Moreover, even if those terms are ambiguous, this rule rests on a reasonable construction of them…*Congress thus implicitly left it to the Department to define "automatically' and 'single function of the trigger' in the event those terms are ambiguous." Id.* (emphasis added).

Here, even setting aside ATF's admission that that "the statutory definition alone determines whether a firearm is a machinegun," it takes the untenable position that the statutory language is so clear that the agency is merely "defining those terms in accordance with the plain meaning;" yet, it concedes that it only has the authority to do such when terms are ambiguous and admits that the terms are

not ambiguous; thereby, precluding it from implementing the Final Rule (since it admits that it lacks the legal authority to define terms that are not ambiguous). Accordingly, ATF's attempt to redefine the term "machinegun" is in violation of its regulatory authority.

## C. THE DISTRICT COURT ERRED IN ITS RELIANCE ON THE CHEVRON DEFERENCE

### 1. The Government has Waived Reliance on the Chevron Deference

As stated above, The District Court utilized the two-step framework of the *Chevron* deference to find the statutory definition of "machinegun" to be ambiguous; that ATF reasonably interpreted the definition of "machinegun"; and therefore, ATF did not exceed its statutory authority in promulgating the Final Rule (the District Court conceded that the 6th Circuit has not analyzed Chevron's applicability to the Final Rule, so it relied upon *Gun Owners of Am., Inc. v. Barr*, No. 19-1298, 2019 WL 1395502, at *1 (6th Cir. Mar. 25, 2019), and *Guedes II*, 920 F.3d at 17). The District Court further held, "the parties here have not thoroughly addressed *Chevron's* applicability to the Rule, both assert that it does not apply. Hardin states that deference is unwarranted because the statutory definition is clear, (see D.N. 30, PageID #708); and ATF refers to the Rule as "an interpretative rule" (D.N. 29, Page ID #205-06), which typically would not receive *Chevron* review, see *Mead Corp.*, 533 U.S. at 232 ("interpretative rules…enjoy no *Chevron*

21

status as a class"), and states that "deference to the agency is not required to resolve this case." (D.N. 31, PageID# 737)" (District Court Opinion, DN35 PageID# 898) Despite neither Hardin nor ATF invoking the *Chevron* Deference, the District Court invoked such on its own volition.

The District Court followed the analysis followed by the D.C. Circuit in *Guedes*, though, as the District Court expressed, the "parties in *Guedes* did not present arguments for applying the *Chevron* framework, and the court therefore conducted its own extensive analysis of whether the Rule qualifies for *Chevron* deference. *Id*. at 17-21 (District Court Opinion, DN35 PageID# 899). In *Guedes*, the government expressly waived reliance on *Chevron*, by telling the Court of Appeals for the D.C. Circuit, that, if the validity of the ATF's Final Rule "turns on the applicability of *Chevron*, it would prefer that the rule be set aside rather than upheld." 920 F. 3d 1, 21 (CADC 2019). Both in *Guedes* and the case at bar, the government failed to invoke the *Chevron* deference, yet both district courts performed its own *Chevron* analysis and thus "placed an uninvited thumb on the scale in favor of the government." Statement of Gorsuch, J., 589 U.S. _____(2020) (in denial of petition for a writ of cert in *Guedes*).

It is not uncommon for the courts to decline the application of *Chevron* when the government chooses not to invoke the doctrine. See Eskridge & Baer, The Continuum of Deference: Supreme Court Treatment of Agency Statutory

Interpretations From *Chevron* to *Hamdan*, 96 Geo. L.J. 1083, 1121-1124 (2008) (collecting cases); Merrill, Judicial Deference to Executive Precedent, 101 Yale L. J. 969, 982-984 (1992) (same); see *BNSF R. Co. v. Loos*, 139 S.Ct. 893 (2019). "If the justification for *Chevron* is that "'policy choices' should be left to executive branch officials 'directly accountable to the people," *Epic Systems*, 584 U.S., at ____ (slip op., at 20)(quoting *Chevron*, 467 U.S. at 865), then the courts must equally respect the Executive's decision not to make policy choices in the interpretation of Congress' handiwork." Statement of Gorsuch, J., 589 U.S. _____(2020) (in denial of petition for a writ of cert in *Guedes*).

In the case at hand, ATF expressly stated that "deference to the agency is not required to resolve this case." (ATF's Opposition to Hardin's Motion for Judgment, DN31 PageID# 737); consequently, the government loses the benefit of *Chevron* in review of this action.

### 2. The Chevron Deference has no Role when Liberty is at Stake

The Final Rule carries with it the possibility of criminal sanctions (26 U.S.C. §5685(b), 18 U.S.C. §924(a)(2)), thus the District Court should have analyzed this case under the Rule of Lenity, not the *Chevron* Deference doctrine. *Chevron* has no part to play when one's liberty is at stake. Under the Constitution, "only the people's elected representatives in the legislature are authorized to 'make an act a

crime" *United States v. Davis*, 139 S. Ct. 2319, 2333 (2019)(quoting *United States v. Hudson*, 7 Cranch 32, 34 (1812)).

### a. The Rule of Lenity Prevails Over the Chevron Deference

The rule of lenity is a "venerable" and "time-honored interpretive guideline," *Liparota v. United States*, 471 U.S. 419, 427 (1985), that predates the Constitution and "is perhaps not much less old than [statutory] construction itself." *United States v. Wiltberger*, 18 U.S. 76, 95 (1820); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 343 (2012) (lenity "reflect[s] the spirit of the common law"). The rule requires, once other standard interpretive tools have been considered, that remaining serious ambiguity or uncertainty in the scope of criminal statutes be resolved in favor of defendants. *See United States v. Rentz*, 777 F.3d 1105, 1113 (10th Cir. 2015) (en banc) ("Our job is always in the first instance to follow Congress's directions. But if those directions are unclear, the tie goes to the presumptively free citizen and not the prosecutor."); *see also United States v. Smith*, 756 F.3d 1179, 1191 (10th Cir. 2014); *Davis* at 2333.

If an agency promulgates a statutory interpretation that is contrary to the interpretation required by the rule of lenity, the time-honored rule of lenity must prevail over the relatively recent doctrine of *Chevron* deference. In interpreting a statute, the court's first obligation is to "exhaust all the traditional tools of

construction." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quotation omitted). Only if those tools cannot resolve statutory ambiguity is *Chevron* deference even a possibility. Thus, *Chevron* regularly gives way to other interpretive tools and canons, such as the doctrine of constitutional avoidance, *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172–73 (2001), the presumption against retroactivity, *I.N.S. v. St. Cyr*, 533 U.S. 289, 320 n.45 (2001), and the presumption against implied causes of action, *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001). In such cases, "there is, for *Chevron* purposes, no ambiguity in such a statute for an agency to resolve." *St. Cyr*, 533 U.S. at 320 n.45. Likewise, even though lenity "is a rule of last resort," *United States v. Richter*, 796 F.3d 1173, 1188 (10th Cir. 2015), it is nonetheless a traditional interpretive tool that a court must apply *before* turning to whether an agency interpretation is reasonable. *See United States v. Granderson*, 511 U.S. 39, 54 (1994) ("[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct— we apply the rule of lenity [to] resolve the ambiguity . . . .").

That conclusion is a necessary corollary of the rule that there is no deference to the executive in the area of criminal law. For example, in *Abramski v. United States*, 573 U.S. 169 (2014), the Supreme Court noted that ATF—as in this case— had changed its view of how to interpret a criminal statute. But even "put[ting] aside" that inconsistency, the Court stated, "[w]e think ATF's old position no more

relevant than its current one—which is to say, not relevant at all." *Id.* at 191. Instead, "criminal laws are for courts, not for the Government, to construe." *Id.* (citing *United States v. Apel*, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference.")). In other words, where criminal penalties are at stake, a court may not defer to an agency's preferred statutory interpretation.

The same holds true for dual-application statutes where the government has sued civilly. Whatever *Chevron*'s virtues, deferring to the government's interpretation in that setting undermines the due process and separation of powers values that animate the rule of lenity. *See Rentz*, 777 F.3d at 1113. Indeed, due process concerns are heightened as to agency interpretations, which change more frequently and erratically than general legislation (as typified by the ATF's inconsistency in this case). *See Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton J., concurring) (arguing that criminal liability based on "a remote statement issued by an administrative agency" violates due process).

And even where an agency regulation is thought to give "fair notice" of prohibited conduct, deference still undermines the "equally important" principle that "only the *legislature* may define crimes" and that "Congress cannot, through ambiguity, effectively leave that function to the courts— *much less to the administrative bureaucracy*." *Whitman v. United States*, 574 U.S. 1003, 1005

(2014) (Scalia, J., statement respecting the denial of certiorari) (second emphasis added); *see also Carter*, 736 F.3d at 730 (Sutton, J., concurring) ("[O]nly the legislature, the most democratic and accountable branch of government, should decide what conduct triggers these consequences."). Put simply, when a statute implicates the rule of lenity, there is no room for *Chevron* deference.

There are only two alternatives to this conclusion, both of which are unpalatable. The first is to prefer *Chevron* in civil cases but follow the rule of lenity in criminal cases. But that would lead to the same statutory language carrying a different meaning in different contexts, resulting in a fractured and confusing trap for the unwary—and conflicting with the bedrock principle that a court "must interpret [a] statute consistently." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). The second is to universally apply *Chevron* deference, even in criminal cases. Not only is that contrary to precedent, *Abramski*, 573 U.S. at 169, but requiring courts to accept prosecutors' pronouncements of law would do incalculable damage to the separation of powers and the liberty it seeks to preserve. The *only* option consistent with justice and fairness is to hold that the rule of lenity, where it applies, takes precedence over *Chevron* deference.

### b. The Rule of Lenity Applies in Civil Statutes that Impose Both Criminal and Civil Penalties

Numerous regulatory statutes authorize federal agencies to impose both criminal *and* civil penalties, and the GCA is one such statute. *See* 18 U.S.C. §§ 922, 923. This "dual-application" statute raises the question: does lenity require that ambiguities be construed against the government in a *civil* action where the underlying statute carries criminal penalties? The answer is yes. Lenity is a rule of construction that instructs a court how to "cho[ose] . . . between two readings," *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221 (1952), and that "help[s] give authoritative meaning" to ambiguous language, *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 n.10 (1992) (plurality op.). A statute's "authoritative meaning" cannot vary from case to case; if lenity applies, it must apply across the board. *See United States v. Santos*, 553 U.S. 507, 523 (2008) (plurality op.) ("[T]he rule of lenity is an additional reason to remain consistent [as to a statute's proper interpretation]."); *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring) ("[A] statute is not a chameleon" whose meaning "change[s] from case to case."); *Moore v. Smith*, 360 F. Supp. 3d 388, 399 n.8 (E.D. La. 2018) ("A court cannot waffle between opposing interpretations of a statute depending on a civil or criminal context.").

That conclusion is well supported by Supreme Court precedent, under which "a narrowing interpretation . . . driven by the rule of lenity must apply equally to civil litigants to whom lenity would not ordinarily extend." *In re Woolsey*, 696

F.3d 1266, 1277 (10th Cir. 2012). For example, in *United States v. Thompson/Ctr. Arms Co.*, the Supreme Court applied lenity "in a civil setting" to resolve ambiguity in a statute with "criminal applications." 504 U.S. at 517–18. Similarly, in *Leocal*, the Court applied lenity "[b]ecause we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context." *Id.* at 11 n.8. These cases confirm that a statute carrying civil and criminal penalties for the same conduct must be interpreted under the rule of lenity, even in civil cases.

### c. The Rule of Lenity Promotes Due Process and the Separation of Powers

The rule of lenity arises from, and reinforces, two vital constitutional principles. *Rentz*, 777 F.3d at 1113; *see also United States v. R.L.C.*, 503 U.S. 291, 308–09 (1992) (Scalia J., concurring). First, the rule of lenity protects due process by "ensur[ing] that criminal statutes will provide fair warning concerning conduct rendered illegal." *Liparota*, 471 U.S. at 427. Because there is no "fair warning" when a criminal statute fails to use language "that the common world would understand," *McBoyle v. United States*, 283 U.S. 25, 27 (1931), fundamental fairness requires that unclear criminal statutes be construed against the drafter. Second, the rule of lenity safeguards the separation of powers, "assuring that the society, through its representatives, has genuinely called for the punishment to be

meted out." *R.L.C.*, 503 U.S. at 309 (Scalia, J., concurring); *see also Rentz*, 777 F.3d at 1113 ("The rule of lenity seeks to ensure legislatures, not prosecutors, decide the circumstances when people may be sent to prison."). In requiring ambiguous language to be construed against the government, the rule "strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota*, 471 U.S. at 427. It thereby ensures that the branch of government most accountable to the people establishes criminal sanctions, rather than an unaccountable bureaucracy, interested prosecutor, or remote judiciary.

### D. THE ATF'S FINAL RULE VIOLATES THE UNITED STATES CONSTITUTION

#### 1. Takings Without Just Compensation

Generally, under the Takings Clause of the Fifth Amendment to the U.S. Constitution, when government laws or regulations result in the taking or destruction of private property, the government must provide just compensation for the value of that property. *Horne v. Dep't of Agric.*, 576 U.S. 351, 356-361 (2015); *Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. 166, 177 (1871). More specifically, an agency regulation amounts to such a taking when "denies all economically beneficial or productive use" of the property or when it "impedes the use of property without depriving the owner of all economically beneficial use," based upon "a complex of factors, including (1) the economic impact of the

regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017).

ATF has made no bones about the property-destroying effect of its Final Rule. It has boldly declared that, upon implementation of the rule, all "manufacturers, current owners, and persons wishing to purchase [bump-stock-type] devices would be subject to the restrictions imposed by the GCA and NFA." 83 Fed. Reg. at 13448. Thus, all "bump-stock-type devices currently possessed by individuals would have to be destroyed or turned in upon implementation of the regulation." *Id.* at 13450." Indeed, given the teeth built into the criminal statutes that ATF seeks to invoke through this application of the Final Rule, the forced dispossession comes on pain of criminal prosecution for failure to comply.

Unquestionably, the effect of this regulation is to destroy "*all* economically beneficial or productive use" and to destroy *all* the "investment-backed expectations" that ATF itself set up through its previous public pronouncements consistently declaring these very same types of devices *lawful* as *not* constituting "machineguns." And the loss of private interests here is substantial. ATF itself assumes "an average sale price for bump-stock-devices from 2012-2017 [of] $200.00," while acknowledging that the prices ranged from $179.95 to $425.95. 83 Fed. Reg. at 13451. It then declares that the primary estimated cost to be

$96,242,750.00 based on an estimate of 520,000 affected bump-stock-devices. However, multiplying ATF's stated average price of $200.00 by the primary estimate yields a value of $104,000,000.00, not $96,242,750.00 as stated in Table 3 of the NPRM. Moreover, by averaging the acknowledged prices for bump-stock-devices, a proper average sale price should be $302.95, which would result in a primary estimated cost of $157,534,000.00 in just compensation being due. (Administrative Record #004154-4156).

At a minimum, for those like Plaintiff Hardin with concretely established damages based on the verified purchase price of their bump-stock-type devices, the government should be compelled as a matter of law under the Takings Clause to provide just compensation in the amount of the purchase price. Moreover, the requirement of just compensation for this destruction of valuable private interests cannot be set aside as a valid exercise of police power, for the simple yet fundamental reason that ATF has not and evidently cannot put forth legitimate support for the core conclusion underlying the Final Rule that these devices constitute "machineguns." *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 429, n. 11 (1989). ("[T]o be a valid exercise of the police power in the first instance a government regulation must be rationally related to a legitimate state interest.").

The District Court held that because "Hardin seeks compensation for the loss of his bump stocks (D.N. 30, PageID# 704), so his claims falls into the second category. But it fails at the threshold, because Hardin does not "concede that the government acted within the scope of its authority," (District Court Opinion, DN 35 PageID# 907). The District Court relied on *Wilkins v. Daniels*, 744 F.3d 409 (6th Cir. 2014), which divided Takings Clause claims into two categories: Public-use challenges and Just-Compensation challenges. However, Hardin's claim for compensation does not automatically pigeon-hole him into a just-compensation challenge whereby he must concede the lawfulness of the Final Rule, and did not preclude the District Court from finding a public use challenge to the Takings Clause. A determination that the ATF exceeded its statutory authority, as argued above (and, as in this case, deprived Hardin of physical property); "the action is invalid regardless of whether compensation is provided." *Wilkins*, 744 F.3d at 417.

## 2. Ex Post Facto Violation

Article I, Section 9, Clause 3 of the U.S Constitution declares that "No Bill of Attainder or ex post facto Law shall be passed." It is well established that this prohibition includes "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action," *Calder v. Bull*, 3 U.S. 386 (1798), and any law that, "in relation to the offence or its consequences, alters the situation of a party to his disadvantage," *Collins v.*

*Youngblood*, 497 U.S. 37, 47 (1990). The specific focus of this proscription is to prevent the retroactive application of laws and regulations whose primary purpose is to impose punishment on the affected citizens or whose impact would be so punitive either in purpose or effect as to negate any claim of a mere intent to effect a civil and nonpunitive regulatory purpose. *See Smith v. Doe*, 538 U.S. 84, 92 (2003); *Johnson v. Quander*, 440 F.3d 489, 500-501 (D.C. Cir. 2006). Much like the unabashed manner in which ATF attempts to destroy all value and beneficial use of bump-stock-type devices without providing any just compensation, ATF openly admits the harsh criminal consequences flowing from its unsupported about-face on the classification of bump-stock-type devices. As the NPRM states (italics added):

> The proposed rule would *replace prior classifications* of bump-stock-type devices, *including* those that ATF previously determined *were* not machineguns. This rule would thus *supplant any prior letter rulings* with which it is inconsistent so that *any* bump-stock device described above qualifies as a machinegun.

> 83 Fed. Reg. at 13448.

And, as already seen, because all "manufacturers, current owners, and persons wishing to purchase such devices would be subject to the restrictions imposed by the GCA and NFA," 83 Fed. Reg. at 13448, everyone is subject *criminally punitive* sanctions for failing to comply with this new world order of ATF – without exception (except for the small class of individuals exempted from

the rule). Indeed, ATF has expressly declared that "there is *no* means by which a possessor may register a firearm retroactively, including a firearm that has been *reclassified*." *Id.* (italics added). So ATF has effectively shackled everyone affected by this new rule, transforming them into criminals based upon their mere possession of any bump-stock-type device *regardless* of whether that device had theretofore been *lawfully* possessed and *regardless of* whether *ATF itself* previously determined the device does *not* to have the capability of converting a firearm into a prohibited "machinegun." This is a prohibited *ex post facto* in the purest sense.

### 3.  ATF's Reversal Creates Constitutional Vagueness

As stated above, between 2008 and 2017, it was essentially the findings of the ATF that "bump-stocks" were merely a firearm part not subject to regulation under Federal firearms laws including NFA provisions. (Administrative Record #000145). It was not until shifting political winds caused government officials to reverse this decade long rule, based, not on law, reason or facts; but on political expediency. Law-abiding citizens who lawfully purchased bump-stocks, in reliance on the ATF's prior pronouncements, now are coerced into destroying or surrendering said products by threat of criminal prosecution.

The NFA subjects "firearms," to various taxes and regulatory requirements, including that the firearm be registered with ATF.  The NFA defines a "firearm" to

include certain guns and gun parts, including silencers, but does not expressly cover "bumps-tock-devices." 18 U.S.C. §921. On its face, the NFA is a taxing scheme, which collects occupational and excise taxes from businesses and transactions involving listed firearms—which include short-barreled rifles, silencers, and destructive devices. *See* 26 U.S.C. §5845(a) (defining "firearm"). ATF is given only narrow statutory authority, essentially, administration and revenue collection functions, and does not provide ATF with general authority to regulate the safety of firearms, firearm accessories, or firearm parts. 6 U.S.C. §531. Moreover, because the ATF has previously found that bump-stock-devices are not firearms (rightfully so because neither the NFA nor GCA defines "machineguns" to include such devices), ATF simply has no authority under either the NFA or GCA to regulate them.

At worst, the ATF is exceeding its authority by regulating bump-stock-devices which fall outside the NFA. At best, the ATF is attempting to manufacture an ambiguity in the NFA as it pertains to machinegun parts, evidenced by the ATF's 180 degree reversal on bump-stocks. It is a basic principle of due process that a law is void for vagueness if its prohibitions are not clearly defined. As held by the U. S. Supreme Court in *Grayned vs. City of Rockford*, 408 U.S. 104 (1972):

> "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the

innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic [Constitutional] freedoms…[and] operates to inhibit the exercise of [those] freedoms."

Having no express statutory authority for the ATF to regulate bump-stock-devices, and Congress having already clearly defined "machinegun" in the NFA, only Congress can amend the NFA to redefine "machinegun" to regulate said devices. Consequently, ATF's revised definition of "machinegun" should not be permitted deference under *Chevron* as argued above. Allowing the ATF to re-define "machinegun," as it has done in this case, due to prevailing political winds, renders Congress' definition of "machinegun" under the NFA a moving target, and thus by definition, constitutionally vague. At hand, the ATF, a federal regulatory body is setting the statutory definition of bump-stock-devices, which will ultimately, be resolved by the judiciary…either way, the result is the creation of legislation by bodies other than Congress.

## E. THE ATF'S FINAL RULE IS ARBITRARY AND CAPRICIOUS

As stated above, a reviewing court may "hold unlawful and set aside agency action … found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A). "Agency action is arbitrary

and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (2017 D.C. Cir.) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43).  Here, given its failure or refusal to produce any records in support of the Final Rule, ATF has presented *no* evidence in support of its "legal analysis" leading to the unprecedented conclusion that bump-stock-type devices are "machineguns" because "they convert a semiautomatic firearm into a firearm that shoots automatically more than one shot, without manual reloading, by a single function of the trigger." 83 Fed. Reg. at 13443. And all the *known* evidence runs directly counter to this conclusion.

Experts opining *on behalf of* ATF have consistently concluded that commonly used bump-stock-type devices manufactured by Slide Fire and Bump Fire Systems do *not* function so as to convert the associated firearm into a "machinegun" because, in fact, the shooter must still separately pull the trigger to fire each successive shot. (Exhibit A to Hardin's Complaint, DN3-1 PageID# 95-99). In all methods of firing, the bump stock device does not, as ATF claims in the NPRM, function as "a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger."

Notwithstanding ATF's redefinition of what constitutes a "*single function of the trigger*" and when a firing cycle occurs "*automatically*," such a redefinition simply does not change the fact that the Final Rule conflicts with clear statutory text and fundamentally alters what it means for a device to be a machine gun. "Regardless of how serious the problem an administrative agency seeks to address, it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (internal citation and quotation marks omitted). Consequently, a court must first question whether a challenged regulation is consistent with the text of the statute. *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1221 (10th Cir. 2017). Such an inquiry asks whether "Congress has directly spoken to the precise question at issue," and, if so, "that is the end of the matter; for the court as well as the agency must give effect to the unambiguously expressed intent of Congress." *Chevron* at 842-43. A court "must reject administrative constructions which are contrary to clear congressional intent," because the "judiciary is the final authority on issues of statutory construction." *Id.* at n. 9; *see also Webster v. Luther*, 163 U.S. 331, 342 (1896)

The NFA "imposes strict registration requirements on statutorily defined 'firearms.'" *Staples v. United States*, 511 U.S. 600, 602 (1994). In the NFA, Congress defined "machinegun" as a specific type of "firearm." The original text

defined a "machinegun" as "any weapon which shoots, or is designed to shoot, automatically, *or semiautomatically*, more than one shot, without manual reloading, by a single function of the trigger." National Firearms Act §1(b) (emphasis added).

The current definition of "machinegun" includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The Final Rule unlawfully attempts to alter the well-settled meaning of the statute. "It's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. ---, 139 S.Ct. 532, 539 (2019) (internal citations and quotation marks omitted). Otherwise, courts "would risk amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands." *Id.* (internal citations and quotation marks omitted).

The Supreme Court has already spoken on this matter when it laid out the current definition of a machinegun being a weapon that fires repeatedly with a single pull of the trigger. "*That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted*. Such weapons are 'machineguns' within the meaning of the Act. We

40

use the term *'semiautomatic' to designate a weapon that fires only one shot with each pull of the trigger*, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired." *Staples*, 511 U.S. at 602 (emphasis added).

As previously argued, the ATF's newly contrived definition contradicts the statute in several ways. First, the new definition improperly defines the term "automatically" to disregard a shooter's additional manual manipulation of the firearm's *trigger* between shots. The statute speaks of automatic fire "that is set in motion by a single function of the trigger," *United States v. Olofson*, 563 F.3d 652 at 658, but the Final Rule pretends that a shooter initiates automatic fire with a bump stock by only "'pull[ing]' the trigger once," even though he must continue "bumping" the trigger between each shot. *Final Rule*, 83 Fed. Reg. at 66533. Second, the Final Rule disregards the other required physical manipulation bump firing. Instead of requiring that the firearm itself continuously operate "by a *single function* of the trigger," the rule's new definition says that additional physical manipulation is irrelevant if it is not "of the *trigger* by the shooter." 83 Fed. Reg. at 66553-54 (emphasis added). Third, the Final Rule improperly disregards "the longstanding distinction between 'automatic' and 'semiautomatic'" firearms, which, at the time of enactment, "depended on whether the shooter played a manual role in the loading and firing process." *Guedes* at 45 (Henderson, J.,

dissenting). Finally, the new rule conflicts with the statute because it would exclude some actual machineguns by re-defining the phrase "single function of the trigger" to mean only the "deliberate and volitional act of the user pulling the trigger." 83 Fed. Reg. at 66534.

Congress carefully chose language that set a clear demarcation between weapons that fired once for every trigger function and machineguns. As argued, Congress' decision to eliminate semiautomatic weapons from the definition of machinegun, while simultaneously expanding the statute's prohibitions to "destructive devices" evinces, if anything, a judgment that a weapon's rate of fire was *not* the metric it used for prohibition. The carefully chosen and employed words of Congress must be respected.  However, ATF's Final Rule has abrogated the statutory distinction between automatic and semiautomatic weapons that Congress created, in favor of the ATF's preferred policy objectives.

Moreover, *even assuming* bump-stock-type devices do or could produce such machinegun-like effects (something Hardin does not concede given the evidence clearly demonstrating otherwise), ATF's own analysis in the NPRM tellingly undermines the validity of the conclusion on which its new rule is based, because it reveals the underlying rationale is capricious and invites total arbitrariness. As noted, because bump-firing is produced by a *technique* and not a particular device, ATF admits that this method of firing can be produced by

myriad means totally unrelated to any bump-stock-style device, such as through certain fashioning of rubber bands or belt loops, or by simply training one's trigger finger to fire more rapidly. 83 Fed. Reg. at 13454.

This acknowledgement can lead to one of only two untenable conclusions: First, ATF is *explicitly approving* the use of such techniques to produce machinegun-like effects, which cannot reasonably be squared with its claim that regulation of bump-stock-type devices is urgently necessary prevent mass-shooting mayhem. Second, ATF is declaring that *any* such manipulations of a semiautomatic firearm to produce this shooting capability is subject to regulation under the Final Rule just the same as if the firearm were a "machinegun." This *does* square logically with the thesis of ATF's NPRM that this *functionality* of firearms, in general, must be stamped out to prevent mass shootings, *but* such a rationale leads to the absurd result that people could be arrested, prosecuted, and convicted of illegal "machinegun" possession, and additionally lose not only their firearms but their Second Amendment rights pursuant to 18 U.S.C. § 922(g)(1), simply because they employed a *technique* on some occasion that happened to produce a "bump-fire" effect.

Either way, all the known evidence (as well as logic and common sense) before ATF and elsewhere concerning the *actual* functionality and utility of bump-stock-type devices, runs diametrically counter to the conclusion on which ATF's

Final Rule rests. Therefore, the Final Rule cannot be sustained and instead must be stricken as invalid. *Stand Up for California! v. United States DOI*, 204 F. Supp. 3d 212, 245 (D.C. 2016) (quoting *Cty. of L.A. v. Shalala*, 192 F.3d 1005, 1021, 338 U.S. App. D.C. 168 (D.C. Cir. 1999) (When an agency "'fail[s] to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.'").

## F. THE PROCESS IN THE PROMULGATION OF THE ATF'S FINAL RULE VIOLATED THE APA

### 1. Procedural Irregularities with Comment Period

The rule-making comment period in question was replete with procedural irregularities and errors. Immediately upon the publication of the NPRM on March 29, 2018, the following advisory appeared on federalregister.gov: "COMMENT PERIOD CLOSED – The comment period on this document is closed and comments are no longer being accepted on Regulations.gov. We apologize for any inconvenience." And, in fact, the website was not accepting comments. When people complained to the Federal Register that they could not submit their comments online, the Federal Register responded that they could not be of any help. It appears that it was not until April 2, 2018 (*i.e.* five days into the comment period) that the declaration that "COMMENT PERIOD CLOSED" was removed from federalregister.gov by ATF and that interested individuals were able to submit comments. Unfortunately, it is likely that numerous individuals, due to the

declaration on federalregister.gov "COMMENT PERIOD CLOSED," were led to believe that they were unable to submit comments in relation to this rulemaking and were therefore deprived of an opportunity to be heard, since they were never informed, after ATF removed the declaration and permitted comments to be filed, that they could then submit comments. (The foregoing facts are contained in the Comments in Opposition to Proposed Rule, ATF 2017R-22, which appears to be omitted from the certified administrative record, so the Court is requested to take judicial notice of its filing contained in Case No. 1:18-cv-02988-DLF (*Guedes, et al, vs. ATF* (District Court for D.C.)).

Further, while the public was directed to federalregister.gov as a resource for all relevant information and as a vehicle through which to submit comments regarding the Final Rule, the website's content was confusing and convoluted. The NPRM identified the rulemaking procedures under "Docket No. 2017R-22," but the information on the website related to these proceedings made no mention of this docket number. Instead, it referred to two *different* docket numbers (ATF-2018-0002 and ATF-2018-0002-0001), and these dockets concerned the ANPRM, for which the comment period had closed in January.

In the Final Rule, the Government admits to there being procedural issues with the comment period and declares that (1) "[t]he Department acknowledges that upon publication of the NPRM on March 29, 2018, there was some confusion

within the first 24 to 48 hours about submitting comments through the Federal eRulemaking Portal," (2) "that on March 29, 2018, when the comment period opened for the NPRM, the link for submitting comments to the NPRM had been inadvertently connected to the Regulations.gov Docket ID number 2018–0001– 0001, which had been used by the Regulations.gov website for the ANPRM comment period, December 26, 2017, through January 25, 2018," and (3) that ATF "acknowledges that there was some confusion because there was a brief period on March 29, 2018, during which the ANPRM link (2018–0001– 0001) was prominently situated on the homepage of the Regulations.gov website even though that link was no longer able to accept comments for the NPRM." 83 Fed. Reg. at 66541-42. (Administrative Record #004145-4147). It is reasonable to presume that, as a result of these technical irregularities and errors in ATF's rulemaking process, numerous people were precluded from being able to timely submit their comments and ATF ultimately never received or actually considered all the comments submitted under the different docket numbers.

## 2. Failure to Provide 90-Day Comment Period

Under 18 U.S.C. § 926(b), ATF was statutorily obligated to provide at least a 90-day public comment period to facilitate the public discourse intended under the APA. As described above, immediately upon the publication of the NPRM, the portal through which concerned citizens were directed to submit online comments,

was shut down and the website specifically declared that the comment period was "closed." As a result, for a minimum of five days of the statutorily required ninety-day comment period, interested individuals were deprived of their ability to submit comments. (Administrative Record #004145-4147).

Even ATF admits "that upon publication of the NPRM on March 29, 2018, there was some confusion within the first 24 to 48 hours about submitting comments through the Federal eRulemaking Portal," and that "there was some confusion because there was a brief period on March 29, 2018, during which the ANPRM link (2018–0001– 0001) was prominently situated on the homepage of the Regulations.gov website even though that link was no longer able to accept comments for the NPRM." 83 Fed. Reg. at 66541-42. (Administrative Record #004145-4147). Furthermore, numerous individuals, due to the declaration on federalregister.gov, were led to believe that they were unable to submit comments in relation to this rulemaking and were therefore deprived of an opportunity to be heard, since they were never informed, after ATF removed the declaration and permitted comments to be filed, that they could now submit comments.

### 3. Failure to Consider Cost-Impact and Erroneous Cost Estimate

ATF ignored analysis in relation to a cost impact, as the proposed rule fails to provide information on how the Government will fulfill its obligation to compensate affected individuals for the taking. As reflected in the NPRM, ATF

assumes "an average sale price for bump-stock-devices from 2012-2017 [of] $200.00," while acknowledging that the prices ranged from $179.95 to $425.95. 83 Fed. Reg. 13451. The proposal then declares the primary estimated cost to be $96,242,750.00 based on ATF's primary estimate of 520,000 bump-stock-devices having been produced. (Administrative Record #004129-4131).

However, multiplying ATF's stated average price of $200.00 by the primary estimate yields a value of $104,000,000.00, not $96,242,750.00 as stated in Table 3 of NPRM. Moreover, by averaging the acknowledged prices for bump-stock-devices, a proper average sale price should be $302.95, which would result in a primary estimated cost of $157,534,000.00 in just compensation being due.

## G. IMPLEMENTATION AND ENFORCEMENT OF THE ATF'S FINAL RULE VIOLATES I.R.C. (26 U.S.C. 7805, ET SEQ.)

ATF's Final Rule is not only procedurally and substantively invalid as set forth above, but any implementation or enforcement of the rule against such devices manufactured or assembled before the date of the NPRM publication would violate 26 U.S.C. §7805(b). 26 U.S.C. §7805(b) provides that "no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before … [t]he date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public." ATF has previously acknowledged the limiting effect of this law on the retroactivity of its firearms regulations, in that it cannot

properly apply a legal reclassification of items produced before this date. *See e.g.,* ATF Rule 82-8 (in reclassifying SM10 and SM11A1 pistols and SAC carbines as "machineguns" under the National Firearms Act, ATF acknowledged that the reclassification was not applicable to those firearms manufactured or assembled before June 21, 1982, pursuant to 26 U.S.C. § 7805(b)); ATF-41F (81 Fed. Reg. 2658 through 2723) (where ATF cited Section 7805(b) in declining to retroactively apply the final rule related to the transfer of regulated firearms and acknowledging that the old law would apply to all transfer applications submitted prior to the effective date of the new rule). Accordingly, to whatever extent the Final Rule may otherwise legitimately be implemented or enforced, it cannot be properly be applied to bump stock devices manufactured before March 29, 2018 – the date of publication of this NPR in the Federal Register – if not, the date of issuance of the Final Rule.

## <u>CONCLUSION</u>

Though ATF's Final Rule runs afoul of the law in many respects, including the APA, Constitution and I.R.C., the seminal problem is that the ATF exceeded its statutory authority by rewriting an Act of Congress. To compound the problem, in its review of the Final Rule, the District Court erroneously relied upon, and then erroneously applied, the *Chevron* Deference doctrine in dismissing Hardin's Complaint, challenging the ATF's bump-stock ban.

ATF waived the *Chevron* Deference, but that notwithstanding; because of the threat of criminal penalties, the District Court should have reviewed this case under the Rule of Lenity, not the *Chevron* doctrine. When reviewed in light of the Rule of Lenity, this controversy must be decided in favor of Hardin, because there can be—*and is*—no deference to the Executive Branch in the area of criminal law and punishment.

Wherefore, Hardin respectfully requests that the District Court's Judgment in favor of ATF; *et al*. (Judgment, DN36 Page ID#911) be overruled and reversed; with instructions to enter an *Order* that Hardin be granted Judgment in his favor in accordance with his underlying *Motion for Judgment*; and that Hardin be granted all relief to which he is entitled consistent with both his *Motion for Judgment* and the *Opinion* of this Court.

Respectfully Submitted,

*s/Jason Todd Hardin*
Jason Todd Hardin
HARDIN LAW, PLLC
P. O. Box 9537
Louisville, Kentucky 40209
Phone: (502) 445-2673
Fax: (502) 219-3323

*s/ J. Allan Cobb*
J. Allan Cobb
COBB LAW PLLC
1303 Clear Springs Trace, Unit 100
Louisville, Kentucky 40223
Phone: (502) 966-7100

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains less than 13,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word processing software in 14-point Times New Roman font.

s/*Jason Todd Hardin*
Jason Todd Hardin

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of February, 2021, I filed the foregoing Brief for Appellant by use of the Sixth Circuit's CM/ECF system. Service of the brief will be accomplished by that system.


_s/Jason Todd Hardin_
Jason Todd Hardin

# ADDENDUM

Designation of Relevant District Court Documents

| Docket No. | Description of Document | Page ID# |
|---|---|---|
| 3 | Complaint | 56 |
| 15 | Defendant's Answer | 150 |
| 29 | Defendants' Motion for Judgment on the Administrative Record | 185 |
| 30 | Plaintiff's Motion for Judgment on the Administrative Record | 683 |
| 31 | Defendants' Opposition to Plaintiff's Motion for Judgment on the Administrative Record | 714 |
| 32 | Plaintiff's Response to Defendants' Motion for Judgment on the Administrative Record | 844 |
| 33 | Defendants' Reply in Support of Motion for Judgment on the Administrative Record | 866 |
| 33 | Plaintiff's Reply to Defendants' Response To Plaintiff's Motion for Judgment on the Administrative Record | 886 |
| 35 | District Court Memorandum and Opinion | 894 |
| 36 | District Court Judgment | 911 |