No. 20-6380

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SCOTT HARDIN,

Plaintiff-Appellant,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the Western District of Kentucky

## BRIEF FOR APPELLEES

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

MICHAEL A. BENNETT
  *Acting United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
BRAD HINSHELWOOD
KYLE EDWARDS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7527*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 514-4214*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ...............................................................1

STATEMENT OF THE ISSUE ....................................................................2

STATEMENT OF THE CASE ......................................................................2

    A.    Statutory Background ..................................................................2

    B.    Prior Classifications of Devices that Convert Semiautomatic Weapons into Machineguns ..........................................................4

    C.    The 2018 Rule ............................................................................7

    D.    Prior Proceedings .....................................................................10

SUMMARY OF ARGUMENT ...................................................................14

STANDARD OF REVIEW ........................................................................17

ARGUMENT .............................................................................................17

I.    The Rule Correctly Applies The Terms "Single Function of the Trigger" And "Automatically" To Conclude That Bump Stocks Fall Within The Definition Of "Machinegun" ............................................................. 17

    A.    A Weapon Equipped With a Bump Stock Fires Multiple Rounds "By a Single Function of the Trigger" ........................................19

    B.    A Weapon Equipped With a Bump Stock Fires "Automatically" Because it Fires "As the Result of a Self-Acting or Self-Regulating Mechanism" ...............................................................................28

II.    Hardin's Remaining Arguments Are Without Merit ............................ 30

    A.    *Chevron* Deference Is Not Relevant Here ...................................30

B.    The Rule Is Procedurally Valid and Does Not Violate the Internal
      Revenue Code..................................................................................31

C.    The Rule Does Not Violate the Ex Post Facto Clause or "Create"
      Vagueness.........................................................................................36

CONCLUSION ................................................................................................ 37

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abramski v. United States,*
573 U.S. 169 (2014) .................................................................................26

*Akins v. United States,*
312 F. App'x 197 (11th Cir. 2009) .................................... 6, 24, 26, 38

*Coalition for Gov't Procurement v. Federal Prison Indus., Inc.,*
365 F.3d 435 (6th Cir. 2004) .................................................................17

*ECM BioFilms, Inc. v. Federal Trade Comm'n,*
851 F.3d 599 (6th Cir. 2017) .................................................................32

*Guedes v. ATF,*
920 F.3d 1 (D.C. Cir. 2019) ..................................................................27

*Gun Owners of Am., Inc. v. Garland,*
992 F.3d 446 (6th Cir. 2021) ...................... 13, 17, 24, 25, 28, 29

*Meyer v. Bush,*
981 F.2d 1288 (D.C. Cir. 1993) ...........................................................34

*Milgroom v. United States,*
651 F. App'x 1001 (Fed. Cir. 2016) .....................................................1

*Modern Sportsman, LLC v. United States,*
145 Fed. Cl. 575 (2019),
*appeal docketed*, No. 20-1107 (Fed. Cir. Nov. 1, 2019) ....................34

*Sierra Club v. Slater,*
120 F.3d 623 (6th Cir. 1997) .................................................................32

*Southern Forest Watch, Inc. v. Jewell,*
817 F.3d 965 (6th Cir. 2016) .................................................................33

*Staples v. United States,*
511 U.S. 600 (1994) ................................................................19, 25, 28

*Stew Farm, Ltd. v. Natural Res. Conservation Serv.*,
   767 F.3d 554 (6th Cir. 2014) ...................................................................1

*Tabb Lakes, Ltd. v. United States*,
   10 F.3d 796 (Fed. Cir. 1993) .................................................................1

*United States v. Camp*,
   343 F.3d 743 (5th Cir. 2003) ...............................................................21

*United States v. Carter*,
   465 F.3d 658 (6th Cir. 2006) ...............................................................21

*United States v. Dodson*,
   519 F. App'x 344 (6th Cir. 2013) ........................................................35

*United States v. Evans*,
   978 F.2d 1112 (9th Cir. 1992) .......................................................22, 26

*United States v. Fleischli*,
   305 F.3d 643 (7th Cir. 2002) .....................................................21, 22, 26

*United States v. Jokel*,
   969 F.2d 132 (5th Cir. 1992) ...............................................................21

*United States v. Oakes*,
   564 F.2d 384 (10th Cir. 1977) .............................................................20

*United States v. Olofson*,
   563 F.3d 652 (7th Cir. 2009) .........................................22, 25, 27, 28

**Statutes:**

Firearm Owners' Protection Act,
   Pub. L. No. 99-308, 100 Stat. 449 (1986) ...........................................3

Gun Control Act of 1968,
   Pub. L. No. 90-618, 82 Stat. 1213 ........................................................3

5 U.S.C. § 706.........................................................................................34

18 U.S.C. § 921(a)(23) ...................................................................................3

18 U.S.C. § 921(a)(30) (2002) ........................................................................4

18 U.S.C. § 922(o) .................................................................................... 3, 17

18 U.S.C. § 926(a) ..........................................................................................3

18 U.S.C. § 926(b) ...................................................................................11, 32

26 U.S.C. § 5841(c) ........................................................................................4

26 U.S.C. § 5845(b) .............................................2, 3, 5, 8, 14, 17, 18, 23, 25

26 U.S.C. § 7801(a)(2)(A) ..............................................................................3

26 U.S.C. § 7805(a) ........................................................................................3

26 U.S.C. § 7805(b) .........................................................................12, 36, 37

28 U.S.C. § 1291 .............................................................................................1

28 U.S.C. § 1295(a)(2) ....................................................................................1

28 U.S.C. § 1331 .............................................................................................1

28 U.S.C. § 1346(a)(2) ....................................................................................1

**Regulations:**

27 C.F.R. § 447.11 ..........................................................................................9

27 C.F.R. § 478.11 ..........................................................................................9

27 C.F.R. § 479.11 ..........................................................................................9

28 C.F.R. § 0.130 ............................................................................................3

**Rule:**

Fed. R. App. P. 4(a)(1)(b) ...........................................................................1

**Legislative Materials:**

H.R. 9741, 73d Cong. (1934) .....................................................................20

H.R. Rep. No. 73-1780 (1934) ..................................................................20

H.R. Rep. No. 90-1956 (1968) ....................................................................3

H.R. Rep. No. 99-495 (1986),
    *reprinted in* 1986 U.S.C.C.A.N. 1327 ...............................................3

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways &*
    *Means*, 73rd Cong. 40 (1934) ..............................................20, 21

S. Rep. No. 973-1444 (1934) .....................................................................20

**Other Authorities:**

1 *Oxford English Dictionary* (1933) ..........................................................28

82 Fed. Reg. 60,929 (Dec. 26, 2017) ....................................................8, 36

83 Fed. Reg. 7949 (Feb. 20, 2018) ..............................................................8

83 Fed. Reg. 13,442 (Mar. 29, 2018) ..........................................9, 33, 34, 36

83 Fed. Reg. 66,514 (Dec. 26, 2018)......................................................*passim*

84 Fed. Reg. 9239 (Mar. 14, 2019) ..............................................................9

*Akins v. United States*, No. 8:08-cv-988, slip op.
    (M.D. Fla. Sept. 23, 2008) ...................................................6, 24

ATF, ATF Ruling 2006-2, *Classification of Devices Exclusively Designed to Increase the Rate of Fire of a Semiautomatic Firearm* (Dec. 13, 2006), https://go.usa.gov/xHd89 .............................................................................. 6, 19, 23, 32

Dep't of Justice, *Department of Justice Announces Bump-Stock-Type Devices Final Rule* (Dec. 18, 2018), https://go.usa.gov/xEDrx ...................................................................9

*Webster's New International Dictionary* (2d ed. 1934) ............................................................28

# STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 to adjudicate

Hardin's Administrative Procedure Act and constitutional claims.  The district court

entered final judgment in the government's favor on November 30, 2020.  Judgment,

RE 36, PageID# 911.  Plaintiff timely appealed on December 2, 2020.  Notice of

Appeal, RE 37, PageID# 912; Fed. R. App. P. 4(a)(1)(b) (60-day time limit).  This

Court has jurisdiction under 28 U.S.C. § 1291.[1]

---

[1] Hardin's complaint also contained a takings claim under the Fifth Amendment, relying on the Little Tucker Act as a source of jurisdiction.  Am. Compl., RE 3, PageID# 81-83; *see* 28 U.S.C. § 1346(a)(2).  The Little Tucker Act grants district courts concurrent jurisdiction with the Court of Federal Claims over certain actions against the United States for money damages "not exceeding $10,000," including takings claims, 28 U.S.C. § 1346(a)(2), and the Court of Appeals for the Federal Circuit generally has jurisdiction over any "appeal from a final decision of a district court . . . if the jurisdiction of that court was based, in whole or in part," on the Little Tucker Act, 28 U.S.C. § 1295(a)(2); *see Stew Farm, Ltd. v. Natural Res. Conservation Serv.*, 767 F.3d 554, 561 (6th Cir. 2014) (recognizing that this Court "lack[s] jurisdiction to review" an appeal where "the jurisdiction of the district court" was "based at least in part on the Little Tucker Act").  However, because Hardin's takings claim did not concede the lawfulness of the government action at issue, *see* Mem. Op., RE 35, PageID# 907-908, the district court lacked jurisdiction to consider that claim under the Little Tucker Act.  *See, e.g.*, *Milgroom v. United States*, 651 F. App'x 1001, 1005 (Fed. Cir. 2016) (explaining that "the Claims Court . . . may only exercise [its] jurisdiction [over takings claims] when the claimant 'concede[s] the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act'" (quoting *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802-03 (Fed. Cir. 1993))).  The district court's jurisdiction therefore was not "based . . . in part" on the Little Tucker Act, and this appeal is within the jurisdiction of this Court, not the Federal Circuit.  Hardin has withdrawn his takings claim on appeal.  *See* Notice of Withdrawal of Specific Claim (Apr. 19, 2021).

## STATEMENT OF THE ISSUE

The issue presented is whether the district court correctly rejected Hardin's claims that bump stocks do not qualify as prohibited "machinegun[s]" under 26 U.S.C. § 5845(b) and correctly held that the Department of Justice rule concluding that those devices so qualify is procedurally and substantively valid.

## STATEMENT OF THE CASE

### A.    Statutory Background

The National Firearms Act of 1934, 26 U.S.C. ch. 53, the first major federal statute to regulate guns, imposed various requirements on persons possessing or engaged in the business of selling certain firearms, including machineguns.  The Act, in its present form, defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  The definition also encompasses parts that can be used to convert a weapon into a machinegun.  A "machinegun" thus includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and

2

any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.*[2]

In 1986, Congress generally barred the sale and possession of new machineguns, making it "unlawful for any person to transfer or possess a machinegun" unless a governmental entity is involved in the transfer or possession. 18 U.S.C. § 922(o). In enacting the ban, Congress incorporated the definition of "machinegun" in the National Firearms Act. *Id.* § 921(a)(23); *see* Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986); *see also* H.R. Rep. No. 99-495, at 2, 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing the machinegun restrictions as "benefits for law enforcement" and citing "the need for more effective protection of law enforcement officers from the proliferation of machine guns").

Congress has vested in the Attorney General the authority to prescribe rules and regulations to enforce the National Firearms Act and other legislation regulating firearms. 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a); *see id.* § 7801(a)(2)(A). The Attorney General has delegated that responsibility to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), a bureau within the Department of Justice. 28 C.F.R. § 0.130.

---

[2] *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1231; H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.) (noting that the bill expanded the definition of "machinegun" to include parts).

Although there is no statutory requirement that manufacturers do so, ATF encourages manufacturers to submit novel weapons or devices to ATF for a classification of whether the weapon or device qualifies as a machinegun or other firearm under the National Firearms Act.  *See* ATF, *National Firearms Act Handbook*, § 7.2.4 (Apr. 2009)[3]; *cf.* 26 U.S.C. § 5841(c) (noting that manufacturers must "obtain authorization" before making a covered firearm and must register "the manufacture of a firearm").  The classification process enables ATF to provide manufacturers with "the agency's official position concerning the status of the firearms under Federal firearms laws" to assist manufacturers with "avoid[ing] an unintended classification and violations of the law" before a manufacturer "go[es] to the trouble and expense of producing" the weapon or device.  *National Firearms Act Handbook*, *supra*, §§ 7.2.4, 7.2.4.1.  ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations."  *Id.* § 7.2.4.1.

## B.    Prior Classifications of Devices that Convert Semiautomatic Weapons into Machineguns

Since the expiration in 2004 of the federal ban on certain semiautomatic "assault weapons,"[4] ATF has received increasing numbers of classification requests for various types of bump stock devices.  *Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514,

---

[3] Available at https://go.usa.gov/xVgqB.
[4] These weapons had been subject to the Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. § 921(a)(30) (2002).

66,516 (Dec. 26, 2018).  Inventors and manufacturers seek to produce "devices that permit shooters to use semiautomatic rifles to replicate automatic fire," but to do so "without converting these rifles into 'machineguns.'"  *Id.* at 66,515-16; *see id.* at 66,516 ("Shooters use [these devices] with semiautomatic firearms to accelerate the firearms' cyclic firing rate to mimic automatic fire.").  To determine whether such devices fall within the statutory definition of a "machinegun," 26 U.S.C. § 5845(b), ATF must determine whether they allow a shooter to fire "automatically more than one shot . . . by a single function of the trigger."

ATF first encountered this type of device in 2002, when it received a classification request for the "Akins Accelerator."  83 Fed. Reg. at 66,517.  The Akins Accelerator, which attached to a standard semiautomatic rifle, used a spring to harness the recoil energy of each shot, causing "the firearm to cycle back and forth, impacting the trigger finger" repeatedly after the first pull of the trigger.  *Id.*  Thus, by pulling the trigger once, the shooter "initiated an automatic firing sequence" that was advertised as firing "approximately 650 rounds per minute."  *Id.*  ATF initially determined that the Akins Accelerator was not a machinegun because it "interpreted the statutory term 'single function of the trigger' to refer to a single movement of the trigger."  *Id.*

In 2006, ATF revisited this determination, concluding that "the best interpretation of the phrase 'single function of the trigger' includes a 'single pull of the trigger.'"  83 Fed. Reg. at 66,517.  The agency explained that the Akins Accelerator created "a weapon that '[with] a single pull of the trigger initiates an automatic firing

5

cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted.'" *Id.* (quoting *Akins v. United States*, No. 8:08-cv-988, slip op. at 5 (M.D. Fla. Sept. 23, 2008)).  Accordingly, ATF reclassified the device as a machinegun under the statute.  *Id.*

 Expecting further classification requests for devices designed to increase the firing rate of semiautomatic weapons, ATF also published a public ruling announcing its interpretation of "single function of the trigger," reviewing the National Firearms Act and its legislative history to explain that the term denoted a "single pull of the trigger."  ATF, ATF Ruling 2006-2, *Classification of Devices Exclusively Designed to Increase the Rate of Fire of a Semiautomatic Firearm* 1-3 (Dec. 13, 2006) (ATF Ruling 2006-2).[5]

When the inventor of the Akins Accelerator challenged ATF's action, the Eleventh Circuit upheld the determination, explaining that interpreting "single function of the trigger" as "'single pull of the trigger' is consonant with the statute and its legislative history," and rejecting a vagueness challenge because "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly."  *Akins v. United States*, 312 F. App'x 197, 200, 201 (11th Cir. 2009) (per curiam).

---

[5] Available at https://go.usa.gov/xHd89.

### C.    The 2018 Rule

**1.**  The type of bump stock at issue in this case is an apparatus used to replace the standard stock on an ordinary semiautomatic firearm, and converts an ordinary semiautomatic rifle into a weapon capable of firing hundreds of bullets per minute with a single pull of the trigger.  Unlike a regular stock, a bump stock channels the recoil from the first shot into a defined path, allowing the weapon contained with the stock to slide back a short distance—approximately an inch and a half—and shifting the trigger away from the shooter's trigger finger.  83 Fed. Reg. at 66,532.  This separation allows the firing mechanism to reset.  *Id.*  When the shooter maintains constant forward pressure on the weapon's barrel-shroud or fore-grip, the weapon slides back along the bump stock, causing the trigger to "bump" the shooter's stationary finger and fire another bullet.  *Id.*  Unlike the Akins Accelerator, these devices do not depend on the action of an internal spring.

When it reclassified the Akins Accelerator, ATF advised that "removal and disposal of the internal spring . . . would render the device a non-machinegun under the statutory definition," because the device would no longer operate "automatically." 83 Fed. Reg. at 66,517.  ATF soon received classification requests for other bump stock devices that did not include internal springs.  In a series of classification decisions between 2008 and 2017, ATF concluded that some such devices were not machineguns based on the premise that in the absence of internal springs or similar

mechanical parts that would channel recoil energy, the bump stocks did not enable a

gun to fire "automatically." *Id.*

**2.** In 2017, a shooter armed with semiautomatic weapons and bump stock

devices killed 58 people and wounded 500 more in Las Vegas. 83 Fed. Reg. at 66,516.

The bump stock devices did not have internal springs and were therefore not of the

type that ATF then believed fell within the definition of machinegun.

At the urging of members of Congress and other non-governmental

organizations, the Department of Justice and ATF undertook a review of the prior

analysis of the terms used to define "machinegun" in 26 U.S.C. § 5845(b), and

published an advance notice of proposed rulemaking in the Federal Register in

December 2017. *Application of the Definition of Machinegun to "Bump Fire" Stocks and Other*

*Similar Devices*, 82 Fed. Reg. 60,929 (Dec. 26, 2017). Public comment on the advance

notice concluded on January 25, 2018. *Id.* at 60,929.

On February 20, 2018, the President issued a memorandum concerning bump

stocks to then-Attorney General Jefferson B. Sessions III. *See* 83 Fed. Reg. 7949

(Feb. 20, 2018). The memorandum instructed the Department of Justice, working

within established legal protocols, "to dedicate all available resources to complete the

review of the comments received [in response to the advanced notice], and, as

expeditiously as possible, to propose for notice and comment a rule banning all

devices that turn legal weapons into machineguns." *Id.*

On March 29, 2018, the Department of Justice published a notice of proposed rulemaking, proposing amendments to the regulations in 27 C.F.R. §§ 447.11, 478.11, and 479.11 regarding the meaning of the terms "single function of the trigger" and "automatically." *See Bump-Stock-Type Devices*, 83 Fed. Reg. 13,442 (Mar. 29, 2018). The notice elicited over 186,000 comments. *See* 83 Fed. Reg. at 66,519.

**3.** The final rule was published in the Federal Register on December 26, 2018. Dep't of Justice, *Department of Justice Announces Bump-Stock-Type Devices Final Rule* (Dec. 18, 2018).[6] The Rule amended regulations issued under the National Firearms Act and the Gun Control Act to address the terms "single function of the trigger" and "automatically" as used in the statutory definition of "machinegun." Consistent with the amended regulation, the Rule rescinded ATF's prior, erroneous classification letters treating certain bump stocks as unregulated firearms parts. *See* 83 Fed. Reg. at 66,514, 66,516, 66,523, 66,530-31, 66,549. In explaining to members of the public that bump stocks are machineguns, the agency provided instructions for "current possessors" of bump stocks "to undertake destruction of the devices" or to "abandon [them] at the nearest ATF office" to avoid liability under the statute. *Id.* at 66,530.

In amending its regulations, the agency explained, as it had previously, that the phrase "single function of the trigger" means a "single pull of the trigger" and clarified that the term also includes "analogous motions." 83 Fed. Reg. at 66,515.

---

[6] Available at https://go.usa.gov/xEDrx. The Rule was later ratified by Attorney General Barr. *See Bump-Stock-Type Devices*, 84 Fed. Reg. 9239 (Mar. 14, 2019).

The Rule further explained that the term "automatically" means "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id.* at 66,519.

The agency explained that bump stocks enable a shooter to engage in a firing sequence that is "automatic." 83 Fed. Reg. at 66,531. As the shooter's trigger finger remains stationary on the ledge provided by the design of the device and the shooter applies constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, the firearm's recoil energy can be directed into a continuous back-and-forth cycle without "the need for the shooter to manually capture, harness, or otherwise utilize this energy to fire additional rounds." *Id.* at 66,532. A bump stock thus constitutes a "self-regulating" or "self-acting" mechanism that allows the shooter to attain continuous firing after a single pull of the trigger, and is therefore a machinegun. *Id.*; *see also id.* at 66,514, 66,518.

### D.    Prior Proceedings

**1.** Plaintiff Scott Hardin, an individual bump-stock owner, brought this suit in January 2019. Am. Compl., RE 3, PageID# 56, 59. Hardin's complaint asserts that the Rule is invalid because the Rule exceeds ATF's statutory authority, was not issued with sufficient notice and comment procedures, did not sufficiently consider the costs resulting from the Rule, was arbitrary and capricious, violates aspects of the Internal Revenue Code, constitutes a taking without compensation under the Fifth

Amendment, and violates the Ex Post Facto and Contract Clauses of the Constitution.  *Id.*, PageID# 70-86.

The district court granted judgment to the government on all of Hardin's claims.  The court held that the interpretation of the statutory terms announced in the Rule warranted *Chevron* deference, that "the statute is ambiguous," and that "ATF reasonably interpreted the definition of 'machinegun'" in determining that bump stocks qualify as machineguns.  Mem. Op., RE 35, PageID# 899.  In particular, the court concluded that the Rule's explanation that bump stocks operate by a "single function of the trigger" was reasonable because "[a]fter the initial exertion of force, a shooter is able to discharge multiple rounds by maintaining constant pressure on the trigger."  *Id.*, PageID# 901, 902 (quotations omitted).

The district court also considered Hardin's procedural challenges to the Rule. Hardin contended that the agency had failed to comply with the Gun Control Act's requirement of providing a 90-day period for public comment because of various errors on the federalregister.gov website for a few days at the beginning of the Rule's comment period.  Mem. Op., RE 35, PageID# 904-905; *see* 18 U.S.C. § 926(b).  The court rejected these arguments, explaining that commenters still "actually ha[d] the ability to submit electronic comments during the entire ninety-day period" through "a simple search for 'bump stock' in the main search bar on Regulations.gov," and also "had the option to comment by fax or mail" for the entire 90-day period.  *Id.*, PageID# 905 (quoting 83 Fed. Reg. at 66,542).  The agency thus "receive[d]

'numerous comments from the very beginning of the comment period.'" *Id.* (quoting 83 Fed. Reg. at 66,542). Thus, even assuming any violation occurred, the court concluded that any error was harmless, particularly given the lack of any evidence "that the technical problems prejudiced commenters." *Id.*, PageID# 905-906.

The court also rejected Hardin's constitutional claims. As relevant here, it held that the Rule did not violate the Ex Post Facto Clause because the Rule "contained a ninety-day delay between its date of publication and its date of implementation . . . giving possessors of bump stocks three months to destroy or relinquish their devices and thereby come into compliance with the Rule." Mem. Op., RE 35, PageID# 906-907. And it held that the Rule did not generate unconstitutional vagueness, because Hardin did not contend "that the Rule's definition of 'machinegun' or its application to bump stocks is unclear." *Id.*, PageID# 908.

The district court also considered two ancillary arguments. It first held that ATF had not violated 26 U.S.C. § 7805(b)'s requirement that "regulation[s] relating to the internal revenue laws" cannot be "appl[ied] to any taxable period ending before" a proposed regulation is publically issued, because the Rule "does not apply to any taxable period" ending before March 29, 2018, when the Rule took effect. Mem. Op., RE 35, PageID# 908-909. It also rejected Hardin's contention that the agency had not properly considered the costs of the Rule, explaining that "ATF was not required to consider the cost of compensation," but in any event "did in fact do a thorough cost-benefit analysis of the Rule." *Id.*, PageID# 909-910.

12

**2.** After the filing of Hardin's opening brief in this appeal, a divided panel of this Court issued a decision in *Gun Owners of America, Inc. v. Garland*, 992 F.3d 446 (6th Cir. 2021). The majority reversed and remanded a district court's denial of a preliminary injunction against the Rule, holding that plaintiffs there were "likely to prevail" on their claim that "a bump stock cannot be classified as a machine gun." *Id.* at 473. The majority held that the statute's reference to the "single function of the trigger" made the "most natural" reading of the provision "that § 5845(b) refers to the trigger itself." *Id.* at 471. The majority believed that this reading was "supported by the fact that the rest of § 5845(b)'s statutory definition of a machine gun describes the firearm, not the shooter, the shooter's body parts, or the shooter's actions." *Id.* The majority thus held that because "the trigger still must be released, reset, and pulled again before another shot may be fired," a weapon equipped with a bump stock is not a machinegun. *Id.*; *accord id.* at 471-72 ("With or without a bump stock, a semiautomatic firearm is capable of firing only a single shot for each pull of the trigger and is unable to fire again until the trigger is released and the hammer of the firearm is reset.").

The Acting Solicitor General has authorized the filing of a petition for rehearing en banc in *Gun Owners of America*. That petition is currently due May 10, 2021.

13

## SUMMARY OF ARGUMENT

Federal law defines a "machinegun" as a weapon that shoots "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The government recognizes that in *Gun Owners of America*, this Court recently addressed the statutory question at issue here and concluded that bump stocks do not qualify as machineguns under the statutory definition. The government is seeking rehearing in *Gun Owners of America*, and thus sets forth its arguments in detail here.

It is not disputed that by attaching a bump stock to a semiautomatic weapon, a shooter can fire hundreds of bullets per minute simply by pulling the trigger once, stabilizing the trigger finger, and maintaining pressure on the front of the weapon. There is no support for the notion that Congress would have intended to omit such a weapon from the statutory definition of machinegun. As the Rule explains—and as ATF has long recognized—the term "single function of the trigger" describes a shooter's "single pull of the trigger" for most weapons. Congress employed the broad term "function" in the statute to ensure that the definition of "machinegun" sweeps in the full range of actions a shooter can take to initiate a firing sequence, thus precluding creative attempts to evade the ban on machineguns. And once that firing sequence is initiated by the shooter's initial pull, it will continue "automatically"—namely, by "a self-acting or self-regulating mechanism," 83 Fed. Reg. at 66,519—until the shooter releases his finger, removes pressure from the front of the weapon, or

14

runs out of ammunition.  A bump stock—which enables a shooter to produce a continuous firing cycle through a single pull of the trigger—thus falls squarely within the scope of the statute.

Hardin's argument to the contrary turns on the mistaken premise, similar to that adopted by the *Gun Owners of America* majority, that a weapon cannot be a "machinegun" if the trigger mechanism on the weapon mechanically operates each time a bullet is discharged.  The relevant question is whether the shooter initiates automatic firing with a single pull of the trigger, not whether the trigger continues to move automatically after that single pull.  That interpretation finds no support in the statutory text, legislative history, or decisions interpreting the statute, which demonstrate that Congress sought to prevent precisely this sort of effort to circumvent the restrictions of the National Firearms Act by devising novel ways of producing and maintaining an automatic firing sequence.  Indeed, Hardin's cramped reading of the statute would mean that a range of devices long recognized to be machineguns—including the Akins Accelerator, an early bump stock understood to be a machinegun for over a decade—would no longer qualify as machineguns, contrary to Congress's clear intent.

Hardin's other arguments likewise do nothing to advance his case.  His extended discussion of *Chevron* deference is beside the point; deference is unnecessary where, as here, the Rule properly interprets the statute, and nothing in the Rule

suggests that the agency adopted anything other than what it perceived to be the best interpretation of the statute.

The Rule is also procedurally valid. As the district court correctly held, interested persons were able to provide comments on the Rule online, by mail, and by fax for the entire 90-day period prescribed by statute; minor technical glitches on the Regulations.gov website did not shorten the comment period. And in any event, any error related to those glitches would be harmless, as numerous individuals submitted comments online from the very beginning of the comment period, and even Hardin contends that all such glitches were resolved with 85 days remaining in the 90-day period.

Hardin's contentions that the agency failed to conduct a proper cost-benefit analysis, that the Rule violates the Internal Revenue Code's prohibition on retroactive application of certain tax regulations, and that the Rule violates the Ex Post Facto Clause or "creates" constitutional vagueness all proceed from the mistaken premise that the Rule creates liability. That is incorrect: bump stocks are machineguns because Congress has designated them as machineguns by statute. Congress's commands with respect to machineguns thus are not subject to cost-benefit analysis; any effects on Hardin proceed from the statute, not the Rule itself; and neither the Ex Post Facto Clause nor principles of vagueness are implicated, given that Hardin does not contend that the statutory definition is unconstitutionally vague.

16

## STANDARD OF REVIEW

This Court reviews the district court's judgment in the government's favor

under the Administrative Procedure Act de novo.  *See, e.g.*, *Coalition for Gov't Procurement*

*v. Federal Prison Indus., Inc.*, 365 F.3d 435, 457 (6th Cir. 2004).

## ARGUMENT

As noted above, a panel of this Court recently held in considering a

preliminary-injunction appeal that a group of plaintiffs were likely to succeed on their

claims that the bump stocks are not within the definition of "machinegun" under 26

U.S.C. § 5845(b) because they do not allow a shooter to fire more than one shot "by a

single function of the trigger."  *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 473

(6th Cir. 2021).  For the reasons outlined below, the government respectfully

disagrees with the Court's interpretation of the statutory text as applied to bump

stocks in that decision, and the Acting Solicitor General has authorized the filing of a

petition for rehearing en banc in that case.  We therefore set forth our arguments in

full, while recognizing that the Court's disposition of *Gun Owners of America* will

control the statutory question here, and we also address Hardin's other arguments,

which were not considered in *Gun Owners of America.*

## I.    The Rule Correctly Applies The Terms "Single Function of the Trigger" And "Automatically" To Conclude That Bump Stocks Fall Within The Definition Of "Machinegun"

Federal law bans the possession and transfer of "machinegun[s]," 18 U.S.C.

§ 922(o), defined in the National Firearms Act as "any weapon which shoots, is

17

designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The definition also includes "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.*

A bump stock replaces the standard stock on an ordinary semiautomatic firearm "for the express purpose of allowing 'rapid fire' operation of the semiautomatic firearm to which [it is] affixed," 83 Fed. Reg. at 66,516, and converts an ordinary semiautomatic rifle into a weapon capable of firing hundreds of bullets per minute with a single pull of the trigger.

Unlike a regular stock, a bump stock channels the recoil from the first shot into a defined path, allowing the contained weapon to slide back a short distance— approximately an inch and a half—and shifting the trigger away from the shooter's trigger finger. 83 Fed. Reg. at 66,532. This separation allows the firing mechanism to reset. *Id.* When the shooter maintains constant forward pressure on the weapon's barrel-shroud or fore-grip, the weapon slides back along the bump stock, causing the trigger to "bump" the shooter's stationary finger and fire another bullet. *Id.* Each successive shot generates its own recoil, which in turn causes the weapon to slide along the bump stock in conjunction with forward pressure, returning to "bump" the shooter's trigger finger each time, initiating another cycle in turn.

To assist the shooter in holding a stationary position with the trigger finger and sustain the firing process, bump stocks are fitted with an "extension ledge." 83 Fed. Reg. at 66,516, 66,532. The shooter places the trigger finger on the extension ledge, ensuring that it is positioned to be "bumped" with each successive cycle. *Id.* at 66,532. This continuous cycle of fire-recoil-bump-fire lasts until the shooter releases the trigger, the weapon malfunctions, or the ammunition is exhausted. *Id.* at 66,519.

## A.    A Weapon Equipped With a Bump Stock Fires Multiple Rounds "By a Single Function of the Trigger"

**1.** The Rule explains that the phrase "single function of the trigger" means "a single pull of the trigger and analogous motions." 83 Fed. Reg. at 66,553. This definition reflects the plain meaning of the statutory terms and Congress's intent in banning the possession of machineguns.

**a.** For over a decade, ATF has recognized that the phrase "single function of the trigger" includes a "single pull of the trigger." *See* 83 Fed. Reg. at 66,517; ATF Ruling 2006-2, at 2. This reflects the common-sense understanding of how most weapons are fired: by the shooter's pull on a curved metal trigger. Courts have frequently applied this straightforward understanding of the term. For example, the Supreme Court has observed that the National Firearms Act treats a weapon that "fires repeatedly with a single pull of the trigger" as a machinegun, in contrast to "a weapon that fires only one shot with each pull of the trigger." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). Similarly, the Tenth Circuit recognized that a weapon

qualified as a machinegun where it could be fired automatically "by fully pulling the trigger." *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977).

That the statute is concerned with the shooter's act of pulling the trigger is confirmed by the legislative history of the National Firearms Act.  In explaining the definition of "machinegun" in the bill that ultimately became the National Firearms Act, *see* H.R. 9741, 73d Cong. (1934), the House Committee on Ways and Means report stated that bill "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and *by a single pull of the trigger*."  H.R. Rep. No. 73-1780, at 2 (1934) (emphasis added); *see* S. Rep. No. 73-1444 (1934) (reprinting House's "detailed explanation" of the provisions, including the quoted language).  Indeed, the then-president of the National Rifle Association used precisely the same terminology in proposing that a machinegun should be defined as a weapon "which shoots automatically more than one shot without manual reloading, by a single function of the trigger." *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73rd Cong. 40 (1934) (statement of Karl T. Frederick, President, National Rifle Association of America).  Explaining this proposal, he stated that "[t]he distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition." *Id.*  Thus, any weapon "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun," while

20

"[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns." *Id.*

**b.** The question under the statute is thus whether the shooter initiates the automatic firing with a single function, not whether the trigger or other parts of the firearm move after the shooter's single function. Indeed, this Court in *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006) (per curiam), applied the statutory definition to a modified weapon that had "no mechanical trigger" at all. *Id.* at 665. Instead, the gun fired automatically when a shooter put a magazine in the weapon, "held it at the magazine port, pulled the bolt back and released it." *Id.* As this Court explained, the weapon was a machinegun because "the manipulation of [an ATF expert's] hands on the assembled weapon initiated a reaction, namely the firing of the gun and two automatic successive firings," and "[t]his manual manipulation constituted a trigger for purposes of the weapon's operation." *Id.*

Other courts have applied similar reasoning, recognizing that a trigger serves "to initiate the firing sequence" of a weapon, however accomplished. *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam); *accord United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002). Courts have thus routinely rejected efforts by criminal defendants to argue that weapons with novel designs do not qualify as machineguns under the Act. *See*, *e.g.*, *United States v. Camp*, 343 F.3d 743, 744-45 (5th Cir. 2003) (holding that a rifle modified with a "switch" that activated a "motor connected to the bottom of a fishing reel" that rotated within the trigger guard causing "the original

21

trigger to function in rapid succession" qualified as a machinegun); *Fleischli*, 305 F.3d at 655-56 (holding that a minigun fired by "an electronic switch" was a machinegun).

These cases underscore that, given the range of possible ways of initiating an automatic firing cycle, Congress used the phrase "single function of the trigger" to "describe[] the action that enables the weapon to 'shoot . . . automatically . . . without manual reloading,' not the 'trigger' mechanism," *United States v. Evans*, 978 F.2d 1112, 1113 n.2 (9th Cir. 1992); *accord United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009) (noting that "a single function of the trigger" "set[s] in motion" the automatic firing of more than one shot). The Rule thus states that a "single function of the trigger" encompasses "a single pull of the trigger and analogous motions" like pressing a button, flipping a switch, or otherwise initiating the firing sequence without pulling a traditional trigger, 83 Fed. Reg. at 66,553, recognizing "that there are other methods of initiating an automatic firing sequence that do not require a pull," *id.* at 66,515; *accord id.* at 66,534; *see id.* at 66,518 n.5 (observing that many machineguns "operate through a trigger activated by a push").

**c.** Bump stocks are "machineguns" because they permit a shooter to automatically fire more than one shot "by a single function of the trigger." With respect to the typical protruding curved trigger on a semiautomatic rifle, the action that initiates the firing sequence is the shooter's pull on the trigger. On an unmodified semiautomatic weapon, that single pull results in the firing of a single shot. For a subsequent shot, the shooter must release his pull on the trigger so that

the hammer can reset.  But on a machinegun—including a weapon equipped with a bump stock—that same single pull of the trigger initiates a continuous process that fires bullets until the ammunition is exhausted.  Once the trigger has initiated the firing sequence in response to the shooter's pull, the weapon fires "automatically more than one shot, without manual reloading."  26 U.S.C. § 5845(b).

The Rule's conclusion that bump stocks permit firing through a "single function of the trigger" is consistent with the agency's long-held understanding of that statutory term.  ATF applied precisely this understanding in reclassifying the Akins Accelerator in 2006.  Like the bump stocks at issue here, the Akins Accelerator enabled the weapon to recoil within the stock, "permitting the trigger to lose contact with the finger and manually reset.  Springs in the Akins Accelerator then forced the rifle forward, forcing the trigger against the finger" in a back-and-forth cycle that enabled continuous firing.  83 Fed. Reg. at 66,517.  The Akins Accelerator "was advertised as able to fire approximately 650 rounds per minute."  *Id.*

After reviewing the Akins Accelerator "based on how it actually functioned when sold," ATF corrected its erroneous earlier decision classifying the device as not a machinegun.  83 Fed. Reg. at 66,517.  In doing so, it relied in part on the legislative history of the National Firearms Act to conclude "that the phrase 'single function of the trigger' . . . was best interpreted to mean a 'single pull of the trigger.'"  *Id.*; *see* ATF Ruling 2006-2, at 2.  The agency concluded that installing the Akins Accelerator on a semiautomatic rifle "resulted in a weapon that '[w]ith a single pull of the trigger

23

initiates an automatic firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted.'" 83 Fed. Reg. at 66,517 (quoting *Akins v. United States*, No. 8:08-cv-988, slip op. at 5 (M.D. Fla. Sept. 23, 2008)).

In rejecting a subsequent challenge by the inventor of the Akins Accelerator to ATF's reclassification of the device, the Eleventh Circuit upheld the agency's understanding of the definition of "machinegun," holding that interpreting "single function of the trigger" as "'single pull of the trigger' is consonant with the statute and its legislative history," and that "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly." *Akins v. United States*, 312 F. App'x 197, 200, 201 (11th Cir. 2009) (per curiam). And on multiple occasions since 2006, ATF has applied the "single pull of the trigger" interpretation to bump-stock-type devices, and on other occasions to "other trigger actuators, two-stage triggers, and other devices." 83 Fed. Reg. at 66,517; *see id.* at 66,518 n.4 (listing examples of other ATF classifications using the definition).

**2.** In interpreting this statutory phrase in *Gun Owners of America*, this Court framed the question as "whether 'function' is referring to the mechanical process (*i.e.*, the act of the trigger's being depressed, released, and reset) or the human process (*i.e.*, the shooter's pulling, or otherwise acting upon, the trigger)." 992 F.3d at 469. Consulting dictionary definitions of the term "function," the majority concluded that

24

those definitions did not resolve the question. *Id.* at 470-71. But in examining the "statutory context," the majority believed that the statute's reference to the "single function of the trigger" made the "most natural" reading of the provision "that § 5845(b) refers to the trigger itself." *Id.* at 471. And the majority believed that that reading was "supported by the fact that the rest of § 5845(b)'s statutory definition describes the firearm, not the shooter, the shooter's body parts, or the shooter's actions." *Id.* The majority thus held that because "the trigger still must be released, reset, and pulled again before another shot may be fired," a weapon equipped with a bump stock is not a machinegun, *id.*; *accord id.* ("With or without a bump stock, a semiautomatic firearm is capable of firing only a single shot for each pull of the trigger and is unable to fire again until the trigger is released and the hammer of the firearm is reset."), a view it believed was supported by the Supreme Court's shorthand description of a machinegun in *Staples*, 511 U.S. at 602 n.1.

The government respectfully disagrees with this analysis. Under the statute, the question is whether "a single function of the trigger" causes the weapon to shoot "automatically more than one shot." 26 U.S.C. § 5845(b). And that is precisely what occurs here: a single function of the trigger (here, a pull of the trigger) "set[s] in motion" the firing of more than one shot through a continuous cycle of fire. *Olofson*, 563 F.3d at 658. That is why the Eleventh Circuit, in considering the Akins Accelerator, held that "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the

firearm repeatedly"—a point confirmed by the legislative history. *Akins*, 312 F. App'x at 201. The fact that the trigger continues to move back and forth against the shooter's stationary finger does not alter that analysis.

Indeed, as *Akins* illustrates, a contrary interpretation would provide a blueprint for ready circumvention of Congress's ban on machineguns. A rifle equipped with a bump stock—particularly one with an internal spring—produces precisely the same results as a weapon all agree qualifies as a machinegun, and does so by automating the trigger's back-and-forth movement against a stationary finger rather than the internal mechanics of the gun. Indeed, as the Rule explains, these devices exist as an effort "to replicate automatic fire without converting these rifles into 'machineguns.'" 83 Fed. Reg. at 66,515-16; *see id.* at 66,516 ("Shooters use [these devices] with semiautomatic firearms to accelerate the firearms' cyclic firing rate to mimic automatic fire."). Nothing indicates that in using the broad term "function" to capture the full range of potential ways to initiate a firing sequence, Congress intended to permit its ban on machineguns to be sidestepped with such ease, and courts have consistently rejected similar efforts at circumvention. *See, e.g.*, *Fleischli*, 305 F.3d at 655; *Evans*, 978 F.2d at 1113 n.2; *cf. Abramski v. United States*, 573 U.S. 169, 185 (2014) (rejecting interpretation of criminal statute that would have "enable[d] evasion of the firearms law").

**3.** Hardin mistakenly contends that a bump stock cannot be a machinegun because continuous fire requires "'bumping' the trigger between each shot." Br. 41.

26

But as explained above, that the trigger continues to move back and forth against the shooter's stationary finger after the initial pull is not dispositive, because automatic fire is "set in motion by a single function of the trigger." *Id.* (quoting *Olofson*, 563 F.3d at 658). To the extent Hardin contends that the shooter's "additional physical manipulation" through continued pressure on the front of the weapon precludes a conclusion that the weapon is a machinegun, *id.*, that too is incorrect. Hardin does not take issue with the fact that "a quite common feature of weapons that indisputably qualify as machine guns is that they require both a single pull of the trigger *and* the application of constant and continuing pressure on the trigger after it is pulled." *Guedes v. ATF*, 920 F.3d 1, 30 (D.C. Cir. 2019). The distinctive feature of a bump stock is that it relocates the focus of that pressure; instead of applying continuous pressure to the trigger itself, the shooter applies continuous pressure to the front of the weapon to enable continuous "bumping" of the stationary trigger finger. That difference is immaterial: Congress did not ban machineguns only to have that ban be circumvented by a shift in the locus of a shooter's pressure on the weapon. Indeed, many weapons require a shooter to use their off hand to bear the weight of the weapon or otherwise exert pressure on the gun while firing, and no one contends that a weapon is not a machinegun because of that manual input.

Contrary to Hardin's assertion (Br. 40-41), the Supreme Court's decision in *Staples* supports ATF's understanding of the statutory text, offering a shorthand description of machineguns that emphasizes that on a non-machinegun, the shooter

27

must make a separate "pull of the trigger" for each shot.  511 U.S. at 602 n.1.  And in

any event, *Staples* did not purport to provide a detailed interpretation of the statutory

terms, instead providing a "glossary" for those terms "[a]s used here."  *Olofson*, 563

F.3d at 657 (quoting *Staples*, 511 U.S. at 602 n.1).

### B.     A Weapon Equipped With a Bump Stock Fires "Automatically" Because it Fires "As the Result of a Self-Acting or Self-Regulating Mechanism"

**1.**  As the Rule explains, "'automatically' is the adverbial form of 'automatic,'

meaning '[h]aving a self-acting or self-regulating mechanism that performs a required

act at a predetermined point in an operation.'"  83 Fed. Reg. at 66,519 (quoting

*Webster's New International Dictionary* 187 (2d ed. 1934); citing 1 *Oxford English Dictionary*

574 (1933) (defining "automatic" as "[s]elf-acting under conditions fixed for it, going

of itself")).  Thus, a weapon fires "automatically" when it fires "as the result of a self-

acting or self-regulating mechanism that allows the firing of multiple rounds."  83

Fed. Reg. at 66,554; *see Olofson*, 563 F.3d at 658 ("automatically" in § 5845(b) means

"as the result of a self-acting mechanism").[7]

---

[7] In *Gun Owners of America*, this Court suggested that dictionary definitions
current in 1968 rather than 1934 should be employed in determining the meaning of
the statutory terms, but that there was no apparent "material change in the meaning
of 'function' from 1934 to 1968 to 1986," when the Firearm Owners' Protection Act
was enacted.  992 F.3d at 470 n.8.  The same conclusion would hold for the term
"automatically."  *See id.* at 492 (White, J., dissenting) ("In 1934, Webster's New
International Dictionary defined 'automatic' as '[h]aving a self-acting or self-regulating
mechanism.'  Dictionaries from 1965 and 1967 do the same." (citations omitted)).

A rifle equipped with a bump stock plainly fits within the ordinary meaning of "automatically." The bump stock "performs a required act at a predetermined point" in the firing sequence by "directing the recoil energy of the discharged rounds into the space created by the sliding stock," ensuring that the rifle moves in a "constrained linear rearward and forward path[]" to enable continuous fire. 83 Fed. Reg. at 66,519, 66,532. This process is also "[s]elf-acting under conditions fixed for it." *Id.* at 66,519. The shooter's positioning of the trigger finger on the extension ledge and application of pressure on the barrel-shroud or fore-stock with the other hand provide the conditions necessary for the bump stock to repeatedly perform its basic purpose: "to eliminate the need for the shooter to manually capture, harness, or otherwise utilize th[e] [recoil] energy to fire additional rounds." *Id.* at 66,532.

**2.** This Court in *Gun Owners of America* did not reach the meaning of the statutory term "automatically." 992 F.3d at 473. For his part, Hardin does not contend that the definition of that term laid out in the Rule—drawn from judicial decisions and dictionaries—is incorrect. Indeed, the entire point of a bump stock is that it automates the process of repeatedly bumping the shooter's stationary trigger finger after the shooter's initial pull, and thus is a "self-acting or self-regulating mechanism" that permits the firing of more than one shot. Hardin argues instead that a bump stock does not operate "automatically" because of the "shooter's additional manual manipulation of the firearm's *trigger* between shots." Br. 41. Hardin does not explain how this is inconsistent with the Rule's definition of the term "automatically,"

29

and his argument on this score simply reprises his objections to the definition of "single function of the trigger" adopted in the Rule.

## II.    Hardin's Remaining Arguments Are Without Merit

Hardin offers a series of other, equally misplaced, arguments in support of his contention that the Rule must be set aside. Were the Court to reach those arguments, it should reject them.

### A.    *Chevron* Deference Is Not Relevant Here

Hardin devotes much of his brief to contending that Chevron deference is inapplicable to the Rule. Br. 21-30. The government, however, has not invoked *Chevron* deference for classification decisions made under the statutory scheme at issue here. And because the 2018 Rule adopts the best interpretation of the statute and should be sustained for that reason alone, it is unnecessary to consider what level of deference, if any, the Rule should be accorded. *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002) (observing that "there is no occasion to defer and no point in asking what kind of deference, or how much" would apply where the agency has adopted "the position [the court] would adopt" when "interpreting the statute from scratch"). In any event, the panel in *Gun Owners of America* devoted considerable attention to the question whether Chevron deference applies to the Rule, *Gun Owners*, 992 F.3d at 454-68, and that discussion would govern here. As discussed, however, the government plans to file a petition for rehearing en banc in that case.

**B.      The Rule Is Procedurally Valid and Does Not Violate the
          Internal Revenue Code**

**1.**  The Gun Control Act provides that when the Attorney General issues
regulations thereunder, he must "give not less than ninety days public notice, and shall
afford interested parties opportunity for hearing, before prescribing such rules and
regulations." 18 U.S.C. § 926(b).  The notice of proposed rulemaking for the Rule
was issued on March 29, 2018, and the agency accepted comments from that date
until 90 days later, on June 27, 2018.  83 Fed. Reg. at 13,442; 83 Fed. Reg. at 66,541-
42.  For the "first 24 to 48 hours" after the posting of the notice of proposed
rulemaking, however, some individuals had difficulty locating the correct online
docket for submitting comments because the link for submitting comments on
Regulations.gov had been inadvertently connected to the docket for the agency's prior
advanced notice of proposed rulemaking.  83 Fed. Reg. at 66,541-42.  The vendor that
administers Regulations.gov quickly created a new docket for the notice of proposed
rulemaking, and there was then "a brief period on March 29, 2018, during which the
ANPRM link . . . was prominently situated on the homepage of the Regulations.gov
website even though that link was no longer able to accept comments for the
NPRM." *Id.*  But despite these technical errors, "the public had the ability to submit
comments through the Federal eRulemaking Portal . . . for the NPRM at all times,"
such as through "a simple search for 'bump stock' in the main search bar on
Regulations.gov." *Id.* at 66,542.  The agency received a large volume of comments in

31

the first few days of the comment period, indicating that many commenters were not impeded from filing comments, and some commenters contacted ATF directly for assistance in filing their comments. *Id.*; *see* Administrative Record Excerpt, RE 29-2, PageID# 297-313 (cataloguing hundreds of comments received through the website in the first few days of the comment period). And in any event, comments online were not the only available option: commenters also had the option to submit comments by mail and fax during the comment period. 83 Fed. Reg. at 66,542; *see* 83 Fed. Reg. at 13,442 (explaining how to submit comments by fax or mail).

Hardin contends that these errors impermissibly shortened the comment period. Br. 44-47. But he cites no authority supporting the premise that minor technical glitches of this sort have that effect, particularly where, as the district court correctly recognized, "commenters did actually have the ability to submit electronic comments during the entire ninety-day period," in addition to their ability to submit comments by mail or fax if they were briefly confused by their online options. Mem. Op., RE 35, PageID# 905. These issues thus "did not shorten the comment period itself." *Id.*

In any event, any error was harmless. *See* 5 U.S.C. § 706. Under harmless-error analysis, "a mistake that . . . causes no prejudice shall not be the basis for reversing an agency's determination." *ECM BioFilms, Inc. v. Federal Trade Comm'n*, 851 F.3d 599, 612 (6th Cir. 2017) (quoting *Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997)). Hardin contends that "[i]t is reasonable to presume that . . . numerous people were

precluded from being able to timely submit their comments." Br. 46. But as the district court explained, Hardin points to no evidence for this premise, "and the evidence in the administrative record points the other way," given that numerous comments were submitted online in the first few days of the comment period. Mem. Op., RE 35, PageID# 905. The district court reached that conclusion even after crediting Hardin's assertions that some vestiges of the initial errors remained on portions of the website until five days into the comment period.[8] Even assuming that were true, "any potentially confused commenters had eighty-five days to return to the website and try again," and the agency ultimately received "more than 186,000 comments, including hundreds within the first two days." *Id.* (citation omitted); *see, e.g.*, *Southern Forest Watch, Inc. v. Jewell*, 817 F.3d 965, 974 (6th Cir. 2016) (observing that "[t]he quantity of feedback from the public suggests . . . that the [agency] fulfilled its duty to solicit public input"). Any error was thus harmless.

**2.** Hardin also contends that the agency failed to conduct an appropriate cost-benefit analysis for the Rule because the Rule did not "provide information on how the Government will fulfill its obligation to compensate affected individuals" for a

---

[8] Hardin asserts that the comment upon which he relies for this premise is not part of the administrative record. Br. 45. As the government explained in district court, that is incorrect: the comment referenced is specifically listed among comments received, and is available in full on the public docket of comments. *See* Administrative Record Excerpts, RE 31-1, PageID# 798 (listing comment ATF-2018-0002-61777 and providing link to https://www.regulations.gov/document/ATF-2018-0002-61777).

taking. Br. 47. Nothing in the Administrative Procedure Act or the relevant firearms statutes requires or even permits a cost-benefit analysis when determining whether a weapon qualifies as a machinegun under the statute. As the Rule explains, because Congress has banned machineguns, "bump-stock-type devices must be regulated because they satisfy the statutory definition of 'machinegun.'" 83 Fed. Reg. at 66,520. As the Rule makes clear, the Department presented cost estimates only to comply with Executive Orders 12,866, 13,563, and 13,771. *See* 83 Fed. Reg. at 66,543. Those Executive Orders do not give rise to enforceable rights, *see Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not . . . subject to judicial review."), and in any event could not override Congress's ban on the possession of new machineguns. Finally, any cost-benefit analysis relating to takings liability would have been unnecessary from the start, as the Rule does not constitute a taking. *See, e.g.*, *Modern Sportsman, LLC v. United States*, 145 Fed. Cl. 575 (2019), *appeal docketed*, No. 20-1107 (Fed. Cir. Nov. 1, 2019) (rejecting takings claim related to the Rule).

**3.** For similar reasons, Hardin is wrong to suggest (Br. 48-49) that enforcement of the Rule against bump stocks would violate 26 U.S.C. § 7805(b), which generally requires that a regulation cannot be applied "to any taxable period ending before" notice of the content of the regulation was provided to the public through various means.

34

As an initial matter, Hardin lacks standing to bring any such claim. His complaint alleges that he did not "bec[ome] interested in purchasing a bump stock device" until April 18, 2018, Am. Compl., RE 3, PageID# 70—more than four months after the December 2017 publication of the advanced notice of proposed rulemaking and weeks after the March 2018 publication of the notice of proposed rulemaking, *see* 82 Fed. Reg. at 60,929; 83 Fed. Reg. at 13,442. Because Hardin acquired his bump stocks after publication of a "notice substantially describing [the Rule's] contents," 26 U.S.C. § 7805(b), Hardin's injury from the Rule—the requirement that he destroy or abandon them—would not be redressed if the Rule were to be invalidated as to bump stocks purchased before notice was given of the Rule.

Hardin's argument is meritless in any event. The relevant legal question is whether Congress has banned bump stocks by statute. Any effect on bump stock owners thus flows not from the Rule or any "final regulation relating to the internal revenue laws," 26 U.S.C. § 7805(b), but instead from the statute itself, and Congress's categorical ban on the possession of new machineguns by the public is not subject to exceptions. For example, in *United States v. Dodson*, 519 F. App'x 344, 349 (6th Cir. 2013), this Court explained that, consistent with § 7805(b), ATF can "retroactively exempt certain weapons from tax and [registration] regulation requirements." But, with respect to whether a weapon is a "machinegun" under § 922(o), the Court held that ATF does not have the ability to "create exceptions" to Congress's statutory ban. *Id.*

### C.    The Rule Does Not Violate the Ex Post Facto Clause or "Create" Vagueness

Hardin contends that the Rule violates the Ex Post Facto Clause of the Constitution.  Br. 33-35.  That argument erroneously assumes that the Rule imposes a prohibition not imposed by the statute itself.  Hardin's argument that the Rule "creates" unconstitutional vagueness (Br. 35-37) is wrong for the same reason: the statute either covers these devices or does not, and Hardin does not contend that the statutory definition is unconstitutionally vague.  *See Akins*, 312 F. App'x at 201 (rejecting vagueness challenge to the statutory definition as applied to the Akins Accelerator).  Hardin's practical concern is also unclear since the government made clear in the Rule that it would not pursue enforcement action against individuals who sold or possessed bump stocks prior to the effective date of the Rule.  83 Fed. Reg. at 66,523.[9]

---

[9] Hardin's opening brief also contained arguments related to a Fifth Amendment takings claim.  Br. 30-33.  Hardin has withdrawn those arguments, and we do not respond to them here.  *See* Notice of Withdrawal of Specific Claim (Apr. 19, 2021).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

MICHAEL A. BENNETT
  *Acting United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

  *s/ Brad Hinshelwood*
BRAD HINSHELWOOD
KYLE EDWARDS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

MAY 2021

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,420 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2021, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.


*s/ Brad Hinshelwood*
Brad Hinshelwood

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 28(b)(1)(A)(i), the government designates the

following district court documents as relevant:

| Record Entry | Description | Page ID# |
|---|---|---|
| RE 3 | Amended Complaint | 56 |
| RE 29-2 | Administrative Record Excerpts | 268 |
| RE 31-1 | Administrative Record Excerpts | 739 |
| RE 35 | Memorandum Opinion and Order | 894 |
| RE 36 | Judgment | 911 |
| RE 37 | Notice of Appeal | 912 |

**ADDENDUM**

## TABLE OF CONTENTS

26 U.S.C. § 5845(b) ...............................................................................................................A1

**26 U.S.C. § 5845(b)**

**§ 5845. Definitions**

(**b) Machinegun.**--The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.